





# RESIDENTIAL LEASE OR
# MONTH-TO-MONTH RENTAL AGREEMENT
(C.A.R. Form LR, Revised 12/15)

Date  **03/15/2017**  ,  **Stanley Kolodziey, Helene Kolodziey** ("Landlord") and
**Melanie Brown** ("Tenant") agree as follows:

1. **PROPERTY:**
   A. Landlord rents to Tenant and Tenant rents from Landlord, the real property and improvements described as: **12135 Summit Ct., Beverly Hills, , CA 90210** ("Premises").
   B. The Premises are for the sole use as a personal residence by the following named person(s) only: **Melanie Brown, 2 children, Chef, Housekeeper & Nanny**.
   C. The following personal property, maintained pursuant to paragraph 11, is included: **All furniture & furnishings including televisions, pots, pans & everything at the house 3/15/17 except personal items** or ☐ (if checked) the personal property on the attached addendum.
   D. The Premises may be subject to a local rent control ordinance                                      .

2. **TERM:** The term begins on (date) **March 18, 2017** ("Commencement Date"), **(Check A or B):**
   ☐ A. **Month-to-Month:** and continues as a month-to-month tenancy. Tenant may terminate the tenancy by giving written notice at least 30 days prior to the intended termination date. Landlord may terminate the tenancy by giving written notice as provided by law. Such notices may be given on any date.
   ☒ B. **Lease:** and shall terminate on (date) **September 17, 2017** at **5:00** ☐ AM/ ☒ PM. Tenant shall vacate the Premises upon termination of the Agreement, unless: **(i)** Landlord and Tenant have extended this Agreement in writing or signed a new agreement; **(ii)** mandated by local rent control law; or **(iii)** Landlord accepts Rent from Tenant (other than past due Rent), in which case a month-to-month tenancy shall be created which either party may terminate as specified in paragraph 2A. Rent shall be at a rate agreed to by Landlord and Tenant, or as allowed by law. All other terms and conditions of this Agreement shall remain in full force and effect.

3. **RENT:** "Rent" shall mean all monetary obligations of Tenant to Landlord under the terms of the Agreement, except security deposit.
   A. Tenant agrees to pay $ **27,000.00** per month for the term of the Agreement.
   B. Rent is payable in advance on the **1st (or** ☐ **18th** **) day** of each calendar month, and is delinquent on the next day.
   C. If Commencement Date falls on any day other than the day Rent is payable under paragraph 3B, and Tenant has paid one full month's Rent in advance of Commencement Date, Rent for the second calendar month shall be prorated and Tenant shall pay 1/30th of the monthly rent per day for each day remaining in prorated second month.
   D. PAYMENT: Rent shall be paid by ☐ personal check, ☐ money order, ☐ cashier's check, or ☐ other **Per landlords instruction**, to (name) _____ (phone) _____ at (address) _____, (or at any other location subsequently specified by Landlord in writing to Tenant) (and ☐ if checked, rent may be paid personally, between the hours of _____ and _____ on the following days _____). If any payment is returned for non-sufficient funds ("NSF") or because tenant stops payment, then, after that: (i) Landlord may, in writing, require Tenant to pay Rent in cash for three months and (ii) all future Rent shall be paid by ☐ money order, or ☐ cashier's check.
   E. Rent payments received by Landlord shall be applied to the earliest amount(s) due or past due.

4. **SECURITY DEPOSIT:**
   A. Tenant agrees to pay $ **54,000.00** as a security deposit. Security deposit will be ☒ transferred to and held by the Owner of the Premises, or ☐ held in Owner's Broker's trust account.
   B. All or any portion of the security deposit may be used, as reasonably necessary, to: **(i)** cure Tenant's default in payment of Rent (which includes Late Charges, NSF fees or other sums due); **(ii)** repair damage, excluding ordinary wear and tear, caused by Tenant or by a guest or licensee of Tenant; **(iii)** clean Premises, if necessary, upon termination of the tenancy; and **(iv)** replace or return personal property or appurtenances. **SECURITY DEPOSIT SHALL NOT BE USED BY TENANT IN LIEU OF PAYMENT OF LAST MONTH'S RENT.** If all or any portion of the security deposit is used during the tenancy, Tenant agrees to reinstate the total security deposit within five days after written notice is delivered to Tenant. Within 21 days after Tenant vacates the Premises, Landlord shall: **(1)** furnish Tenant an itemized statement indicating the amount of any security deposit received and the basis for its disposition and supporting documentation as required by California Civil Code § 1950.5(g); and **(2)** return any remaining portion of the security deposit to Tenant.
   C. Security deposit will not be returned until all Tenants have vacated the Premises and all keys returned. Any security deposit returned by check shall be made out to all Tenants named on this Agreement, or as subsequently modified.
   D. No interest will be paid on security deposit unless required by local law.
   E. If the security deposit is held by Owner, Tenant agrees not to hold Broker responsible for its return. If the security deposit is held in Owner's Broker's trust account, **and** Broker's authority is terminated before expiration of this Agreement, **and** security deposit is released to someone other than Tenant, **then** Broker shall notify Tenant, in writing, where and to whom security deposit has been released. Once Tenant has been provided such notice, Tenant agrees not to hold Broker responsible for the security deposit.

5. **MOVE-IN COSTS RECEIVED/DUE:** Move-in funds made payable to **Stanley Kolodziey** shall be paid by ☐ personal check, ☐ money order, or ☐ cashier's check.

| Category | Total Due | Payment Received | Balance Due | Date Due |
|---|---|---|---|---|
| Rent from **03/15/2017** to _____ (date) | $27,000.00 | | $27,000.00 | 03/16/2017 |
| *Security Deposit | $54,000.00 | | $54,000.00 | |
| Other _____ | | | | |
| Other _____ | | | | |
| Total | $81,000.00 | | $81,000.00 | 03/16/2017 |

*The maximum amount Landlord may receive as security deposit, however designated, cannot exceed two months' Rent for unfurnished premises, or three months' Rent for furnished premises.

Tenant's Initials (_____) (_____)         Landlord's Initials (_____) (_____)

© 2015, California Association of REALTORS®, Inc.

**LR REVISED 12/15 (PAGE 1 OF 6)**
**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 1 OF 6)**

Premises: **12135 Summit Ct., Beverly Hills, , CA  90210**_____ Date: **March 15, 2017**_____

6. **LATE CHARGE; RETURNED CHECKS:**
   A. Tenant acknowledges either late payment of Rent or issuance of a returned check may cause Landlord to incur costs and expenses, the exact amounts of which are extremely difficult and impractical to determine. These costs may include, but are not limited to, processing, enforcement and accounting expenses, and late charges imposed on Landlord. If any installment of Rent due from Tenant is not received by Landlord within **5 (or ☐ _____ ) calendar days** after the date due, or if a check is returned, Tenant shall pay to Landlord, respectively, an additional sum of $ _250.00_____ or _____ % of the Rent due as a Late Charge and $25.00 as a NSF fee for the first returned check and $35.00 as a NSF fee for each additional returned check, either or both of which shall be deemed additional Rent.
   B. Landlord and Tenant agree that these charges represent a fair and reasonable estimate of the costs Landlord may incur by reason of Tenant's late or NSF payment. Any Late Charge or NSF fee due shall be paid with the current installment of Rent. Landlord's acceptance of any Late Charge or NSF fee shall not constitute a waiver as to any default of Tenant. Landlord's right to collect a Late Charge or NSF fee shall not be deemed an extension of the date Rent is due under paragraph 3 or prevent Landlord from exercising any other rights and remedies under this Agreement and as provided by law.

7. **PARKING: (Check A or B)**
   [X] A. Parking is permitted as follows: **In garage**_____
   _____.
   The right to parking [X] is ☐ is not included in the Rent charged pursuant to paragraph 3. If not included in the Rent, the parking rental fee shall be an additional $ _____ per month. Parking space(s) are to be used for parking properly licensed and operable motor vehicles, except for trailers, boats, campers, buses or trucks (other than pick-up trucks). Tenant shall park in assigned space(s) only. Parking space(s) are to be kept clean. Vehicles leaking oil, gas or other motor vehicle fluids shall not be parked on the Premises. Mechanical work or storage of inoperable vehicles is not permitted in parking space(s) or elsewhere on the Premises.
   OR ☐ B. Parking is not permitted on the Premises.

8. **STORAGE: (Check A or B)**
   ☐ A. Storage is permitted as follows: **In houses & garage**_____
   The right to separate storage space ☐ is, ☐ is not, included in the Rent charged pursuant to paragraph 3. If not included in the Rent, storage space fee shall be an additional $ _____ per month. Tenant shall store only personal property Tenant owns, and shall not store property claimed by another or in which another has any right, title or interest. Tenant shall not store any improperly packaged food or perishable goods, flammable materials, explosives, hazardous waste or other inherently dangerous material, or illegal substances.
   OR ☐ B. Except for Tenant's personal property, contained entirely within the Premises, storage is not permitted on the Premises.

9. **UTILITIES:** Tenant agrees to pay for all utilities and services, and the following charges: **Cable, Internet, security that will remain in**_____ . except ___**Landlords name & landlord will forward the bills**_____ , which shall be paid for by Landlord. If any utilities are not separately metered, Tenant shall pay Tenant's proportional share, as reasonably determined and directed by Landlord. If utilities are separately metered, Tenant shall place utilities in Tenant's name as of the Commencement Date. Landlord is only responsible for installing and maintaining one usable telephone jack and one telephone line to the Premises. Tenant shall pay any cost for conversion from existing utilities service provider.

10. **CONDITION OF PREMISES:** Tenant has examined Premises and, if any, all furniture, furnishings, appliances, landscaping and fixtures, including smoke detector(s).
    **(Check all that apply:)**
    ☐ A. Tenant acknowledges these items are clean and in operable condition, with the following exceptions: _____
    _____.
    ☐ B. Tenant's acknowledgment of the condition of these items is contained in an attached statement of condition (C.A.R. Form MIMO).
    ☐ C. (i) Landlord will Deliver to Tenant a statement of condition (C.A.R. Form MIMO) ☐ within **3 days** after execution of this Agreement; ☐ prior to the Commencement Date; ☐ within **3 days** after the Commencement Date.
    (ii) Tenant shall complete and return the MIMO to Landlord within **3 (or ☐ _____) days** after Delivery. Tenant's failure to return the MIMO within that time shall conclusively be deemed Tenant's Acknowledgement of the condition as stated in the MIMO.
    [X] D. Tenant will provide Landlord a list of items that are damaged or not in operable condition within **3 (or ☐ _____) days** after Commencement Date, not as a contingency of this Agreement but rather as an acknowledgement of the condition of the Premises.
    ☐ E. Other: _____.

11. **MAINTENANCE USE AND REPORTING:**
    A. Tenant shall properly use, operate and safeguard Premises, including if applicable, any landscaping, furniture, furnishings and appliances, and all mechanical, electrical, gas and plumbing fixtures, carbon monoxide devices and smoke alarms, and keep them and the Premises clean, sanitary and well ventilated. Tenant shall be responsible for checking and maintaining all carbon monoxide detectors and any additional phone lines beyond the one line and jack that Landlord shall provide and maintain. Tenant shall immediately notify Landlord, in writing, of any problem, malfunction or damage with any item including carbon monoxide devices and smoke alarms on the property. Tenant shall be charged for all repairs or replacements caused by Tenant, pets, guests or licensees of Tenant, excluding ordinary wear and tear. Tenant shall be charged for all damage to Premises as a result of failure to report a problem in a timely manner. Tenant shall be charged for repair of drain blockages or stoppages, unless caused by defective plumbing parts or tree roots invading sewer lines.
    B. [X] Landlord ☐ Tenant shall water the garden, landscaping, trees and shrubs, except: **Automatic sprinklers**_____
    _____.
    C. [X] Landlord ☐ Tenant shall maintain the garden, landscaping, trees and shrubs, except: _____
    _____.
    D. [X] Landlord ☐ Tenant shall maintain **Pool**_____.
    E. Landlord and Tenant agree that State or local water use restrictions shall supersede any obligation of Landlord or Tenant to water or maintain any garden, landscaping, trees or shrubs pursuant to 11B, 11C, and 11D.
    F. Tenant's failure to maintain any item for which Tenant is responsible shall give Landlord the right to hire someone to perform such maintenance and charge Tenant to cover the cost of such maintenance.
    G. The following items of personal property are included in the Premises without warranty and Landlord will not maintain, repair or replace them: _____.

Tenant's Initials ( _____ ) ( _____ )                Landlord's Initials ( _____ ) ( _____ )

Premises: **12135 Summit Ct., Beverly Hills, , CA  90210** _____ Date: **March 15, 2017** _____

12. **NEIGHBORHOOD CONDITIONS:** Tenant is advised to satisfy him or herself as to neighborhood or area conditions, including schools, proximity and adequacy of law enforcement, crime statistics, proximity of registered felons or offenders, fire protection, other governmental services, availability, adequacy and cost of any wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, cemeteries, facilities and condition of common areas, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Tenant.

13. **PETS:** Unless otherwise provided in California Civil Code §54.2, no animal or pet shall be kept on or about the Premises without Landlord's prior written consent, ☐ except as agreed to in the attached Pet Addendum (C.A.R. Form PET).

14. ☐ (If checked) **NO SMOKING:** No smoking of any substance is allowed on the Premises or common areas. If smoking does occur on the Premises or common areas, (i) Tenant is responsible for all damage caused by the smoking including, but not limited to stains, burns, odors and removal of debris; (ii) Tenant is in breach of this Agreement; (iii) Tenant, guests, and all others may be required to leave the Premises; and (iv) Tenant acknowledges that in order to remove odor caused by smoking, Landlord may need to replace carpet and drapes and paint the entire premises regardless of when these items were last cleaned, replaced, or repainted. Such actions and other necessary steps will impact the return of any security deposit. The Premises or common areas may be subject to a local non-smoking ordinance.

15. **RULES/REGULATIONS:**
    A. Tenant agrees to comply with all Landlord rules and regulations that are at any time posted on the Premises or delivered to Tenant. Tenant shall not, and shall ensure that guests and licensees of Tenant shall not, disturb, annoy, endanger or interfere with other tenants of the building or neighbors, or use the Premises for any unlawful purposes, including, but not limited to, using, manufacturing, selling, storing or transporting illicit drugs or other contraband, or violate any law or ordinance, or commit a waste or nuisance on or about the Premises.
    B. **(If applicable, check one)**
       ☒ 1. Landlord shall provide Tenant with a copy of the rules and regulations within ___**5**___ days or _____.
       OR ☐ 2. Tenant has been provided with, and acknowledges receipt of, a copy of the rules and regulations.

16. ☐ (If checked) **CONDOMINIUM; PLANNED UNIT DEVELOPMENT:**
    A. The Premises are a unit in a condominium, planned unit development, common interest subdivision or other development governed by a homeowners' association ("HOA"). The name of the HOA is _____. Tenant agrees to comply with all HOA covenants, conditions and restrictions, bylaws, rules and regulations and decisions ("HOA Rules"). Landlord shall provide Tenant copies of HOA Rules, if any. Tenant shall reimburse Landlord for any fines or charges imposed by HOA or other authorities, due to any violation by Tenant, or the guests or licensees of Tenant.
    B. **(Check one)**
       ☐ 1. Landlord shall provide Tenant with a copy of the HOA Rules within _____**7**_____ days or _____.
       OR ☐ 2. Tenant has been provided with, and acknowledges receipt of, a copy of the HOA Rules.

17. **ALTERATIONS; REPAIRS:** Unless otherwise specified by law or paragraph 29C, without Landlord's prior written consent, **(i)** Tenant shall not make any repairs, alterations or improvements in or about the Premises including: painting, wallpapering, adding or changing locks, installing antenna or satellite dish(es), placing signs, displays or exhibits, or using screws, fastening devices, large nails or adhesive materials; **(ii)** Landlord shall not be responsible for the costs of alterations or repairs made by Tenant; **(iii)** Tenant shall not deduct from Rent the costs of any repairs, alterations or improvements; and **(iv)** any deduction made by Tenant shall be considered unpaid Rent.

18. **KEYS; LOCKS:**
    A. Tenant acknowledges receipt of (or Tenant will receive ☐ prior to the Commencement Date, or ☐ **Commencement date** _____ ):
       ☒ **2**___ key(s) to Premises,         ☒ **2**___ remote control device(s) for garage door/gate opener(s),
       ☒ **2**___ key(s) to mailbox,          ☐ _____ ,
       ☒ **1**___ key(s) to common area(s),   ☐ _____ .
    B. Tenant acknowledges that locks to the Premises ☐ have, ☐ have not, been re-keyed.
    C. If Tenant re-keys existing locks or opening devices, Tenant shall immediately deliver copies of all keys to Landlord. Tenant shall pay all costs and charges related to loss of any keys or opening devices. Tenant may not remove locks, even if installed by Tenant.

19. **ENTRY:**
    A. Tenant shall make Premises available to Landlord or Landlord's representative for the purpose of entering to make necessary or agreed repairs, (including, but not limited to, installing, repairing, testing, and maintaining smoke detectors and carbon monoxide devices, and bracing, anchoring or strapping water heaters), decorations, alterations, or improvements, or to supply necessary or agreed services, or to show Premises to prospective or actual purchasers, tenants, mortgagees, lenders, appraisers, or contractors.
    B. Landlord and Tenant agree that 24-hour written notice shall be reasonable and sufficient notice, except as follows: (1) 48-hour written notice is required to conduct an inspection of the Premises prior to the Tenant moving out, unless the Tenant waives the right to such notice. (2) If Landlord has in writing informed Tenant that the Premises are for sale and that Tenant will be notified orally to show the premises (C.A.R. Form NSE), then, for the next 120 days following the delivery of the NSE, notice may be given orally to show the Premises to actual or prospective purchasers. (3) No written notice is required if Landlord and Tenant orally agree to an entry for agreed services or repairs if the date and time of entry are within one week of the oral agreement. (4) No notice is required: **(i)** to enter in case of an emergency; **(ii)** if the Tenant is present and consents at the time of entry; or **(iii)** if the Tenant has abandoned or surrendered the Premises.
    C. ☐ (If checked) Tenant authorizes the use of a keysafe/lockbox to allow entry into the Premises and agrees to sign a keysafe/lockbox addendum (C.A.R. Form KLA).

20. **SIGNS:** Tenant authorizes Landlord to place FOR SALE/LEASE signs on the Premises.

21. **ASSIGNMENT; SUBLETTING:** Tenant shall not sublet all or any part of Premises, or assign or transfer this Agreement or any interest in it, without Landlord's prior written consent. Unless such consent is obtained, any assignment, transfer or subletting of Premises or this Agreement or tenancy, by voluntary act of Tenant, operation of law or otherwise, shall, at the option of Landlord, terminate this Agreement. Any proposed assignee, transferee or sublessee shall submit to Landlord an application and credit information for Landlord's approval and, if approved, sign a separate written agreement with Landlord and Tenant. Landlord's consent to any one assignment, transfer or sublease, shall not be construed as consent to any subsequent assignment, transfer or sublease and does not release Tenant of Tenant's obligations under this Agreement.

Tenant's Initials ( _____ ) ( _____ )         Landlord's Initials ( _____ ) ( _____ )



**LR REVISED 12/15 (PAGE 3 OF 6)**
**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 3 OF 6)**
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com         **Melanie Brown**

Premises: **12135 Summit Ct., Beverly Hills, , CA  90210** _____ Date: **March 15, 2017**

22. **JOINT AND INDIVIDUAL OBLIGATIONS:** If there is more than one Tenant, each one shall be individually and completely responsible for the performance of all obligations of Tenant under this Agreement, jointly with every other Tenant, and individually, whether or not in possession.
23. ☐ **LEAD-BASED PAINT (If checked):** Premises were constructed prior to 1978. In accordance with federal law, Landlord gives and Tenant acknowledges receipt of the disclosures on the attached form (C.A.R. Form FLD) and a federally approved lead pamphlet.
24. ☐ **MILITARY ORDNANCE DISCLOSURE:** (If applicable and known to Landlord) Premises are located within one mile of an area once used for military training, and may contain potentially explosive munitions.
25. ☐ **PERIODIC PEST CONTROL:** Landlord has entered into a contract for periodic pest control treatment of the Premises and shall give Tenant a copy of the notice originally given to Landlord by the pest control company.
26. ☐ **METHAMPHETAMINE CONTAMINATION:** Prior to signing this Agreement, Landlord has given Tenant a notice that a health official has issued an order prohibiting occupancy of the property because of methamphetamine contamination. A copy of the notice and order are attached.
27. **MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Landlord nor Brokers, if any, are required to check this website. If Tenant wants further information, Tenant should obtain information directly from this website.)
28. **POSSESSION:**
    A. Tenant is not in possession of the Premises. If Landlord is unable to deliver possession of Premises on Commencement Date, such Date shall be extended to the date on which possession is made available to Tenant. If Landlord is unable to deliver possession within **5 (or ☐ _____ ) calendar days** after agreed Commencement Date, Tenant may terminate this Agreement by giving written notice to Landlord, and shall be refunded all Rent and security deposit paid. Possession is deemed terminated when Tenant has returned all keys to the Premises to Landlord.
    B. ☐ Tenant is already in possession of the Premises.
29. **TENANT'S OBLIGATIONS UPON VACATING PREMISES:**
    A. Upon termination of this Agreement, Tenant shall: **(i)** give Landlord all copies of all keys or opening devices to Premises, including any common areas; **(ii)** vacate and surrender Premises to Landlord, empty of all persons; **(iii)** vacate any/all parking and/or storage space; **(iv)** clean and deliver Premises, as specified in paragraph C below, to Landlord in the same condition as referenced in paragraph 10; **(v)** remove all debris; **(vi)** give written notice to Landlord of Tenant's forwarding address; and **(vii)** _____ .
    B. All alterations/improvements made by or caused to be made by Tenant, with or without Landlord's consent, become the property of Landlord upon termination. Landlord may charge Tenant for restoration of the Premises to the condition it was in prior to any alterations/improvements.
    C. **Right to Pre-Move-Out Inspection and Repairs: (i)** After giving or receiving notice of termination of a tenancy (C.A.R. Form NTT), or before the end of a lease, Tenant has the right to request that an inspection of the Premises take place prior to termination of the lease or rental (C.A.R. Form NRI). If Tenant requests such an inspection, Tenant shall be given an opportunity to remedy identified deficiencies prior to termination, consistent with the terms of this Agreement. **(ii)** Any repairs or alterations made to the Premises as a result of this inspection (collectively, "Repairs") shall be made at Tenant's expense. Repairs may be performed by Tenant or through others, who have adequate insurance and licenses and are approved by Landlord. The work shall comply with applicable law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. **(iii)** Tenant shall: **(a)** obtain receipts for Repairs performed by others; **(b)** prepare a written statement indicating the Repairs performed by Tenant and the date of such Repairs; and **(c)** provide copies of receipts and statements to Landlord prior to termination. Paragraph 29C does not apply when the tenancy is terminated pursuant to California Code of Civil Procedure § 1161(2), (3) or (4).
30. **BREACH OF CONTRACT; EARLY TERMINATION:** In addition to any obligations established by paragraph 29, in the event of termination by Tenant prior to completion of the original term of the Agreement, Tenant shall also be responsible for lost Rent, rental commissions, advertising expenses and painting costs necessary to ready Premises for re-rental. Landlord may withhold any such amounts from Tenant's security deposit.
31. **TEMPORARY RELOCATION:** Subject to local law, Tenant agrees, upon demand of Landlord, to temporarily vacate Premises for a reasonable period, to allow for fumigation (or other methods) to control wood destroying pests or organisms, or other repairs to Premises. Tenant agrees to comply with all instructions and requirements necessary to prepare Premises to accommodate pest control, fumigation or other work, including bagging or storage of food and medicine, and removal of perishables and valuables. Tenant shall only be entitled to a credit of Rent equal to the per diem Rent for the period of time Tenant is required to vacate Premises.
32. **DAMAGE TO PREMISES:** If, by no fault of Tenant, Premises are totally or partially damaged or destroyed by fire, earthquake, accident or other casualty that render Premises totally or partially uninhabitable, either Landlord or Tenant may terminate this Agreement by giving the other written notice. Rent shall be abated as of the date Premises become totally or partially uninhabitable. The abated amount shall be the current monthly Rent prorated on a 30-day period. If the Agreement is not terminated, Landlord shall promptly repair the damage, and Rent shall be reduced based on the extent to which the damage interferes with Tenant's reasonable use of Premises. If damage occurs as a result of an act of Tenant or Tenant's guests, only Landlord shall have the right of termination, and no reduction in Rent shall be made.
33. **INSURANCE:** Tenant's or guest's personal property and vehicles are not insured by Landlord, manager or, if applicable, HOA, against loss or damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. **Tenant is advised to carry Tenant's own insurance (renter's insurance) to protect Tenant from any such loss or damage.** Tenant shall comply with any requirement imposed on Tenant by Landlord's insurer to avoid: **(i)** an increase in Landlord's insurance premium (or Tenant shall pay for the increase in premium); or **(ii)** loss of insurance.
34. **WATERBEDS/PORTABLE WASHERS:** Tenant shall not use or have waterbeds on the Premises unless: **(i)** Tenant obtains a valid waterbed insurance policy; **(ii)** Tenant increases the security deposit in an amount equal to one-half of one month's Rent; and **(iii)** the bed conforms to the floor load capacity of Premises. Tenant shall not use on the Premises ☐ Portable Dishwasher ☐ Portable Washing Machine.
35. **WAIVER:** The waiver of any breach shall not be construed as a continuing waiver of the same or any subsequent breach.

Tenant's Initials ( _____ ) ( _____ )       Landlord's Initials ( _____ ) ( _____ )

**LR REVISED 12/15 (PAGE 4 OF 6)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 4 OF 6)**

Premises: **12135 Summit Ct., Beverly Hills, , CA  90210** _____ Date: **March 15, 2017**

36. **NOTICE:** Notices may be served at the following address, or at any other location subsequently designated:
    Landlord: _To be provided prior to commencement date_       Tenant: **Melanie Brown**
    _____               **12135 Summit Ct.**
    _____               **Beverly Hills, CA 90210**
    _____               _____

37. **TENANT ESTOPPEL CERTIFICATE:** Tenant shall execute and return a tenant estoppel certificate delivered to Tenant by Landlord or Landlord's agent within **3 days** after its receipt. Failure to comply with this requirement shall be deemed Tenant's acknowledgment that the tenant estoppel certificate is true and correct, and may be relied upon by a lender or purchaser.

38. **REPRESENTATION**
    A. **TENANT REPRESENTATION; OBLIGATIONS REGARDING OCCUPANTS; CREDIT:** Tenant warrants that all statements in Tenant's rental application are accurate. Landlord requires all occupants 18 years of age or older and all emancipated minors to complete a lease rental application. Tenant acknowledges this requirement and agrees to notify Landlord when any occupant of the Premises reaches the age of 18 or becomes an emancipated minor. Tenant authorizes Landlord and Broker(s) to obtain Tenant's credit report periodically during the tenancy in connection with the modification or enforcement of this Agreement. Landlord may cancel this Agreement: **(i)** before occupancy begins; **(ii)** upon disapproval of the credit report(s); or **(iii)** at any time, upon discovering that information in Tenant's application is false. A negative credit report reflecting on Tenant's record may be submitted to a credit reporting agency if Tenant fails to fulfill the terms of payment and other obligations under this Agreement.
    B. **LANDLORD REPRESENTATIONS:** Landlord warrants that, unless otherwise specified in writing, Landlord is unaware of **(i)** any recorded Notices of Default affecting the Premise; **(ii)** any delinquent amounts due under any loan secured by the Premises; and **(iii)** any bankruptcy proceeding affecting the Premises.

39. **MEDIATION:**
    A. Consistent with paragraphs B and C below, Landlord and Tenant agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action.
    B. The following matters are excluded from mediation: **(i)** an unlawful detainer action; **(ii)** the filing or enforcement of a mechanic's lien; and **(iii)** any matter within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation provision.
    C. Landlord and Tenant agree to mediate disputes or claims involving Listing Agent, Leasing Agent or property manager ("Broker"), provided Broker shall have agreed to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to such Broker. Any election by Broker to participate in mediation shall not result in Broker being deemed a party to this Agreement.

40. **ATTORNEY FEES:** In any action or proceeding arising out of this Agreement, the prevailing party between Landlord and Tenant shall be entitled to reasonable attorney fees and costs, collectively not to exceed $1,000 (or $_____), except as provided in paragraph 39A.

41. **C.A.R. FORM:** C.A.R. Form means the specific form referenced or another comparable form agreed to by the parties.

42. **OTHER TERMS AND CONDITIONS; SUPPLEMENTS:** ☐ Interpreter/Translator Agreement (C.A.R. Form ITA); _____
    ☐ Keysafe/Lockbox Addendum (C.A.R. Form KLA); ☐ Lead-Based Paint and Lead-Based Paint Hazards Disclosure (C.A.R. Form FLD); _____
    ☐ Landlord in Default Addendum (C.A.R. Form LID)
    _42A. Tenant shall have an option for an additional 6 months & an option to purchase with first right of refusal to purchase._
    The following ATTACHED supplements are incorporated in this Agreement: _____
    _____

43. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed except in writing. This Agreement is subject to California landlord-tenant law and shall incorporate all changes required by amendment or successors to such law. This Agreement and any supplement, addendum or modification, including any copy, may be signed in two or more counterparts, all of which shall constitute one and the same writing.

44. **AGENCY:**
    A. **CONFIRMATION:** The following agency relationship(s) are hereby confirmed for this transaction:
       Listing Agent: (Print firm name) _____ **KELLER WILLIAMS BEVERLY HILLS**
       is the agent of (check one): ☒ the Landlord exclusively; or ☐ both the Landlord and Tenant.
       Leasing Agent: (Print firm name) _____ **HILTON HYLAND**
       (if not same as Listing Agent) is the agent of (check one): ☒ the Tenant exclusively; or ☐ the Landlord exclusively; or ☐ both the Tenant and Landlord.
    B. **DISCLOSURE:** ☐ (If checked): The term of this lease exceeds one year. A disclosure regarding real estate agency relationships (C.A.R. Form AD) has been provided to Landlord and Tenant, who each acknowledge its receipt.

45. ☐ **TENANT COMPENSATION TO BROKER:** Upon execution of this Agreement, Tenant agrees to pay compensation to Broker as specified in a separate written agreement between Tenant and Broker.

46. ☐ **INTERPRETER/TRANSLATOR:** The terms of this Agreement have been interpreted for Tenant into the following language: _____. Landlord and Tenant acknowledge receipt of the attached interpreter/translator agreement (C.A.R. Form ITA).

Tenant's Initials ( _____ ) ( _____ )        Landlord's Initials ( _____ ) ( _____ )

**LR REVISED 12/15 (PAGE 5 OF 6)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 5 OF 6)**

Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com         **Melanie Brown**



Premises: **12135 Summit Ct., Beverly Hills, , CA  90210** _____ Date: **March 15, 2017** _____

**47. NOTICE OF RIGHT TO RECEIVE FOREIGN LANGUAGE TRANSLATION OF LEASE/RENTAL AGREEMENTS:** California Civil Code requires a landlord or property manager to provide a tenant with a foreign language translation copy of a lease or rental agreement. If the agreement was negotiated primarily in Spanish, Chinese, Korean, Tagalog or Vietnamese. If applicable, every term of the lease/rental needs to be translated except for, among others, names, dollar amounts and dates written as numerals, and words with no generally accepted non-English translation.

**48. OWNER COMPENSATION TO BROKER:** Upon execution of this Agreement, Owner agrees to pay compensation to Broker as specified in a separate written agreement between Owner and Broker (C.A.R. Form LL or LCA).

**49. RECEIPT:** If specified in paragraph 5, Landlord or Broker, acknowledges receipt of move-in funds.

> Landlord and Tenant acknowledge and agree Brokers: **(a)** do not guarantee the condition of the Premises; **(b)** cannot verify representations made by others; **(c)** cannot provide legal or tax advice; **(d)** will not provide other advice or information that exceeds the knowledge, education or experience required to obtain a real estate license. Furthermore, if Brokers are not also acting as Landlord in this Agreement, Brokers: **(e)** do not decide what rental rate a Tenant should pay or Landlord should accept; and **(f)** do not decide upon the length or other terms of tenancy. Landlord and Tenant agree that they will seek legal, tax, insurance and other desired assistance from appropriate professionals.

**Tenant agrees to rent the Premises on the above terms and conditions.**

Tenant  _____ _Melanie Brown_  Date _03/15/2017_ _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____
Tenant  _____ Date _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

☐ **GUARANTEE:** In consideration of the execution of this Agreement by and between Landlord and Tenant and for valuable consideration, receipt of which is hereby acknowledged, the undersigned ("Guarantor") does hereby: **(i)** guarantee unconditionally to Landlord and Landlord's agents, successors and assigns, the prompt payment of Rent or other sums that become due pursuant to this Agreement, including any and all court costs and attorney fees included in enforcing the Agreement; **(ii)** consent to any changes, modifications or alterations of any term in this Agreement agreed to by Landlord and Tenant; and **(iii)** waive any right to require Landlord and/or Landlord's agents to proceed against Tenant for any default occurring under this Agreement before seeking to enforce this Guarantee.

Guarantor (Print Name) _____
Guarantor _____ Date _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

**Landlord agrees to rent the Premises on the above terms and conditions.**

Landlord  _____ Date _____  Landlord  _____ Date _____
         _Stanley Kolodziey_                                                _Helene Kolodziey_
Address _____
Telephone _____ Fax _____ E-mail _____

**REAL ESTATE BROKERS:**
**A.** Real estate brokers who are not also Landlord under this Agreement are not parties to the Agreement between Landlord and Tenant.
**B.** Agency relationships are confirmed in paragraph 44.
**C.** **COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker (Leasing Firm) and Cooperating Broker agrees to accept: **(i)** the amount specified in the MLS, provided Cooperating Broker is a Participant of the MLS in which the Property is offered for sale or lease or a reciprocal MLS; or **(ii)** ☐ (if checked) the amount specified in a separate written agreement between Listing Broker and Cooperating Broker.

Real Estate Broker (Listing Firm) **KELLER WILLIAMS BEVERLY HILLS** _____ CalBRE Lic. # **00616212** _____
By (Agent) _____ **Dee Crawford**  CalBRE Lic. # **#00971791**   Date **03/15/2017** _____
Address **439 N Canon Dr.** _____  City **Beverly Hills** _____  State **CA**   Zip **90210** _____
Telephone **(310)259-4428** _____  Fax _____  E-mail **deecrawford@kw.com &/or deecrawford7 @aol.com** _____
Real Estate Broker (Leasing Firm) **HILTON HYLAND** _____ CalBRE Lic. # _____
By (Agent) _____ **Barbara Tanenbaum**  CalBRE Lic. # **00823256**   Date **03/15/2017** _____
Address **250 N. Canon dr.** _____  City **Beverly Hills** _____  State **CA**   Zip **90210** _____
Telephone _____  Fax _____  E-mail _____

© 2015, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

**LR REVISED 12/15 (PAGE 6 OF 6)**
**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 6 OF 6)**

##XXH1309DPCSTM

Page 1   (18)

Account #:

This statement: March 31, 2017
Last statement: February 28, 2017

Contact us:
800 773-7100

Sunset/Doheny Office
9229 Sunset Boulevard
West Hollywood CA 90069

006                               0830L
OSIRIS, INC.
6355 TOPANGA CANYON BLVD SUITE 225
WOODLAND HILLS CA 91367

cnb.com

*Handwritten notes:*
20 000
19 000
15 000
Barclay $54,000
Pevs. $3,000
Joint 3000
4000
$7000

## Business Checking Account

| Account Summary | | Account Activity | | | |
|---|---|---|---|---|---|
| Account number | | Beginning bal | (2/28/2017) | | $101,962.38 |
| Minimum balance | $-8,900.00 | Deposits | (3) | + 85,586.31 | |
| Average balance | $55,141.63 | Electronic cr | (3) | + 28,857.50 | |
| Avg. collect bal | $44,227.00 | Other credits | (4) | + 62,110.00 | |
| | | Total credits | | | +$176,553.81 |
| | | Checks paid | (18) | - 55,872.23 | |
| | | Electronic db | (20) | - 180,574.19 | |
| | | Other debits | (13) | - 42,069.77 | |
| | | Total debits | | | - $278,516.19 |
| | | Ending balance | (3/31/2017) | | $0.00 |

### DEPOSITS

| Date | Description | Reference | Credits | Control Number |
|---|---|---|---|---|
| 3-14 | Deposit | | 1,999.58 | 000008290031100 |
| 3-16 | Deposit | | 65,732.76 | 000008050104600 |
| 3-23 | Deposit | | 17,853.97 | 000008070098800 |

### ELECTRONIC CREDITS

| Date | Description | | Credits | Control Number |
|---|---|---|---|---|
| 3-7 | Preauthorized Credit CURVES INTL OPER CORP PAY CCD OSIRIS, INC INVOICE 277 | | 27,982.50 | 021000022820895 |
| 3-21 | Preauthorized Credit NBCUNIVERSAL MED VENDOR PMT OSIRIS INC CTX | | 375.00 | 021000024469850 |
| 3-27 | Preauthorized Credit NBCUNIVERSAL MED VENDOR PMT OSIRIS INC CTX | | 500.00 | 021000026462967 |

### OTHER CREDITS

| Date | Description | Reference | Credits | Control Number |
|---|---|---|---|---|
| 3-13 | Ck Card Refund MERCHANT REFUND TERMINAL 443106 AMERICAN AIR 605512FORT WORT TX TRAN DATE 03-10-17 | | 400.00 | 000009780000000 |

##XXH1309DFCSTM

OSIRIS, INC.  
March 31, 2017

Page 2  
Account #:

**OTHER CREDITS (Continued)**

| Date | Description | Reference | Credits | Control Number |
|---|---|---|---|---|
| 3-16 | Transfer Credit TRANSFER FROM DEPOSIT ACCOUNT | | 50,000.00 | 468000316173851 |
| 3-27 | Transfer Credit TRANSFER FROM DEPOSIT ACCOUNT | | 2,810.00 | 468000327112243 |
| 3-31 | Transfer Credit TRANSFER FROM DEPOSIT ACCOUNT | | 8,900.00 | 468000331121648 |

**CHECKS PAID**

| Number | Date | Amount | Control |
|---|---|---|---|
| 2555 | 03-10 | 800.00 | 000008280064000 |
| 2556 | 03-17 | 1,000.00 | 000002630241500 |
| 2557 | 03-21 | 600.00 | 000008020049000 |
| 8890 * | 03-09 | 524.00 | 000010160223600 |
| 8891 | 03-16 | 1,733.00 | 000010190201800 |
| 8892 | 03-16 | 300.00 | 000010070173900 |
| 8893 | 03-21 | 500.00 | 000010200057700 |
| 8894 | 03-17 | 5,000.00 | 000010260944200 |
| 8921 * | 03-15 | 3,250.00 | 000008290032100 |
| 8923 * | 03-14 | 62.23 | 000010240250200 |
| 8925 * | 03-17 | 12,075.00 | 000010320193400 |
| 8926 | 03-17 | 800.00 | 000010320132400 |
| 8927 | 03-21 | 800.00 | 000010350163200 |
| 8929 * | 03-17 | 7,799.00 | 000010220385600 |
| 8930 | 03-17 | 8,319.00 | 000010310093000 |
| 8931 | 03-24 | 3,310.00 | 000005170031200 |
| 8934 * | 03-30 | 8,750.00 | 000010170131500 |
| 8936 * | 03-30 | 150.00 | 000010110095800 |

* Skip in check sequence

**ELECTRONIC DEBITS**

| Date | Description | Debits | Control Number |
|---|---|---|---|
| 3-1 | Domestic Wire | 706.00 | 170301000006696 |
| 3-1 | Preauthorized Debit BARCLAYCARD US CREDITCARD WEB STEPHEN BELAFO | 20,000.00 | 091000014424332 |
| 3-2 | Preauthorized Debit AETNA SGR CCD OSIRIS INC | 1,972.11 | 028000086555830 |
| 3-2 | Ck Card AMERICAN AIR      613897FORT WORT TX TRAN DATE 02-28-17 | 35.00 | 000009780010000 |
| 3-6 | Ck Card AMERICAN AIR      700256FORT WORT TX TRAN DATE 03-02-17 | 90.80 | 000009780000000 |

##XXH1309DPCSTM

OSIRIS, INC.  
March 31, 2017

Page 3  
Account #:

**ELECTRONIC DEBITS (Continued)**

| Date | Description | Debits | Control Number |
|---|---|---|---|
| 3-10 | Preauthorized Debit PAYCHEX EIB INVOICE OSIRIS INC CCD | 58.00 | 021000020547526 |
| 3-10 | Preauthorized Debit ATT PAYMENT WEB STEPHEN BELAFO | 692.92 | 031100207327014 |
| 3-13 | Ck Card AT T S823 5703 LOS ANGEL CA TRAN DATE 03-10-17 | 2,500.00 | 000008219380000 |
| 3-14 | Preauthorized Debit JPMORGAN CHASE EXT TRNSFR MELANIE BROWN CCD | 955.91 | 021000023029632 |
| 3-15 | Domestic Wire | 25,000.00 | 170315000002350 |
| 3-16 | Domestic Wire | 81,000.00 | 170316000007969 |
| 3-17 | Card COLKERS UNION 76 BEVERLY H CA TRAN DATE 03-16-17 | 7.95 | 000007545250000 |
| 3-17 | Ck Card CAFFE DELL ARTE BEVERLY H CA TRAN DATE 03-16-17 | 14.55 | 000002000970000 |
| 3-17 | Ck Card ANASTASIA SKIN CAR E INC BEVERLY H CA TRAN DATE 03-16-17 | 59.95 | 000000023990000 |
| 3-20 | Domestic Wire | 6,000.00 | 170317000009415 |
| 3-20 | Domestic Wire | 7,403.00 | 170320000008025 |
| 3-20 | Preauthorized Debit BARCLAYCARD US CREDITCARD WEB STEPHEN BELAFO | 19,000.00 | 091000011293489 |
| 3-20 | Ck Card GO GREEK YOGURT BEVERLY H CA TRAN DATE 03-16-17 | 28.05 | 000001002540000 |
| 3-24 | Preauthorized Debit BARCLAYCARD US CREDITCARD WEB STEPHEN BELAFO | 15,000.00 | 091000018424521 |
| 3-24 | Ck Card HTTP: WWW GOGOAIR COM IL TRAN DATE 03-23-17 | 49.95 | 000000006600000 |

**OTHER DEBITS**

| Date | Description | Reference | Debits | Control Number |
|---|---|---|---|---|
| 3-1 | Account Transfer Dr. TO ACC | | 3,000.00 | 294000301115120 |
| 3-1 | Service Charge DOMESTIC WIRE | | 35.00 | 170301000006696 |
| 3-9 | Account Transfer Dr. TO ACC | | 3,000.00 | 294000309211212 |
| 3-14 | Account Transfer Dr. TO ACC | | 4,000.00 | 294000314143240 |
| 3-15 | Service Charge DOMESTIC WIRE | | 35.00 | 170315000002350 |
| 3-16 | Service Charge DOMESTIC WIRE | | 35.00 | 170316000007969 |
| 3-17 | Service Charge TNET TRANS. DETAIL (1-500) FOR 02/17 | | 20.55 | 000000000000000 |
| 3-17 | Service Charge TNET MAINTENANCE ( 1ST ACCT) FOR 02/17 | | 85.00 | 000000000000000 |
| 3-17 | Service Charge TNET MAINT (ACCTS 2-25) FOR 02/17 | | 200.00 | 000000000000000 |
| 3-20 | Service Charge DOMESTIC WIRE | | 35.00 | 170317000009415 |
| 3-20 | Service Charge DOMESTIC WIRE | | 35.00 | 170320000008025 |
| 3-23 | Transfer Debit TRANSFER TO DEPOSIT ACCOUNT | | 13,785.20 | 468000323172242 |
| 3-24 | Transfer Debit TRANSFER TO DEPOSIT ACCOUNT | | 17,804.02 | 468000324164348 |

##XXH1309DPCSTM

OSIRIS, INC.
March 31, 2017

Page 4
Account #:

DAILY BALANCES

| Date  | Amount     | Date  | Amount    | Date  | Amount    |
|-------|------------|-------|-----------|-------|-----------|
| 02-28 | 101,962.38 | 03-13 | 96,831.05 | 03-23 | 32,853.97 |
| 03-01 | 78,221.38  | 03-14 | 93,812.49 | 03-24 | -3,310.00 |
| 03-02 | 76,214.27  | 03-15 | 65,527.49 | 03-27 | .00       |
| 03-06 | 76,123.47  | 03-16 | 98,192.25 | 03-30 | -8,900.00 |
| 03-07 | 104,105.97 | 03-17 | 62,811.25 | 03-31 | .00       |
| 03-09 | 100,481.97 | 03-20 | 30,310.20 |       |           |
| 03-10 | 98,931.05  | 03-21 | 28,785.20 |       |           |

```
                                     8   that you and members of your staff would only
e?                                   9   communicate with Melanie because of Stephen's aggressive
e. We were                          10   conduct?
g. We were                          11        A   No.
started for                         12        Q   You testified that in 2014 or '15, Mel
we're doing.                        13   sent that instruction to you and members of your staff,
Belafonte                           14   you can't recall if she copied Mr. Belafonte on it,
reparation of                       15   telling you that she wanted to authorize, personally
                                    16   authorize all transactions exceeding $5,000.
't know                             17            You remember that; right?
                                    18        A   I do.
il Stephen                          19            MS. WIESNER: Objection. Compound. Misstates
 provide you                        20   his testimony. Argumentative.
nissing for                         21   BY MS. JAMRA:
 the 2016                           22        Q   Do you recall the Events Locker
                                    23   investment?
 have,                              24        A   No.
 And then people                    25        Q   You don't recall that?
ved, and we

         Page 182                                               Page 184
andle on the                         1        A   Not right now.
                                     2        Q   Do you recall an investment in a internet
ige that you                         3   site or an application, if you will, to book events that
Stephen                              4   one could do online?
ssing records                        5        A   Maybe vaguely. But it's very vague.
6 returns?                           6        Q   If were there any transactions exceeding
. I know                             7   $5,000 after you received that e-mail from Melanie,
 I can't say                         8   would it be fair to say that your firm would not have
 the bookkeeper.                     9   issued any checks or wire transactions unless you
lex would be                        10   specifically had an e-mail authorization from Melanie?
they did it.                        11        A   All I can say is we were trying to do our
afonte was                          12   best. I'm certain we could have missed a few because
ever been a                         13   there's just a lot of volume. We would try.
te and you or                       14        Q   With respect to the Serafina documents,
                                    15   just so I'm clear, Serafina investment, I should say,
are of.                             16   when transactions were made, such as payments to
re                                  17   vendors, payments for equipment, et cetera, et cetera,
vn, was there an                    18   how would you normally notate that? If somebody said,
ut not having                       19   "We need a 500,000 wire or 200,000 wire," how would you
ause of abusive                     20   internally document what that wire was for?
                                    21            MR. WRIGHT: I want to clarify. Are you
                                    22   referring to the capital investment or are you referring
 to the file                        23   to the day-to-day --
ed among your                       24            MS. JAMRA: Any and all expenses, moneys that
ot going to have                    25   were used for the Serafina Restaurant.
```

Page 201

1  business managers do, he didn't do any of the
2  accounting. He didn't do the books. He didn't write
3  checks. But he was negotiating the contracts. And he
4  was involved in things that were non-accounting related.
5     Q  And so when investments were made, and
6  moneys were earned, let's say, were you able to track
7  the redeposit of moneys into Osiris or other bank
8  accounts?
9     A  I believe so.
10    Q  At or about April of 2017, did Melanie
11 instruct you to close the Osiris Corp.?
12    A  Yes.
13    Q  Did she instruct you to separate the
14 parties' finances?
15    A  Yes.
16    Q  Did she instruct you to open a new
17 corporation for her?
18    A  Yes.
19    Q  And that was the Formel Corp. that you
20 opened?
21    A  It is Formel.
22    Q  Did she provide with you any other
23 instructions with respect to the parties' finances?
24    A  I don't know. I can't remember very
25 much.

Page 202

1     Q  Did you manage any of Formel Corp's
2  transactions and business accounts?
3     A  I don't remember. If we did, it was not
4  a significant amount. There probably was a little bit
5  in the beginning.
6     Q  At any time prior to April 1 of 2017, did
7  Stephen ever instruct you to close Osiris, Inc.?
8     A  Osiris?
9     Q  Yes.
10    A  No.
11    Q  Did he ever instruct you to separate bank
12 accounts?
13    A  No.
14    Q  Did he ever instruct you to open a
15 brand-new account for his income and Melanie's income?
16    A  No. And what I'd like to say is, Formel
17 came about because she was worried that the money was
18 going to disappear. That's what that was done for. She
19 was also worried that she was trying to get money to
20 move out of the house. She was frightened. She told me
21 that.
22    Q  And you believed her?
23    A  Well, I'm not a doctor or psychologist.
24 I listen to clients. If she says she's frightened, I
25 have to assume she's telling the truth.

Page 203

1     Q  When Melanie gave you all these
2  instructions in April of 2017, you didn't check with
3  Stephen. You went ahead and followed her instructions,
4  didn't you?
5     A  We formed Formel.
6     Q  I just need a "yes" or "no." You didn't
7  check with Stephen. You followed her instructions,
8  didn't you?
9        MS. WIESNER: It's argumentative.
10       THE WITNESS: We did not --
11       MS. JAMRA: Can you let him answer a question
12 without --
13       MR. WRIGHT: Relax.
14       MS. WIESNER: You don't have to be nasty. Let
15 me finish.
16 BY MS. JAMRA:
17    Q  Did you follow her instructions? "Yes"
18 or "no"?
19    A  We followed her instructions because --
20    Q  I don't need a because.
21    A  The because is important.
22    Q  I don't need a because.
23       MS. WIESNER: Quit arguing with the witness.
24       THE WITNESS: This is important. Because I
25 and our staff were truly worried, maybe she was telling

Page 204

1  the truth.
2        I'm not a psychologist. But when people
3  say they're worried or they're worried for their
4  children's safety, I'm not going to say, "Well, let's
5  see if they are." I listen to her. I don't know.
6        So we did go ahead. We knew she was
7  renting a house. We knew she wanted to get out of
8  there. She asked us, and you could tell there was
9  fright in her voice, "Do not give a phone number or
10 address to Stephen."
11 BY MS. JAMRA:
12    Q  I'm not asking you any of that. She was
13 the boss. She instructed you and you followed her
14 instructions?
15    A  No. She was fearful. She was fearful.
16       MS. WIESNER: Argumentative.
17 BY MS. JAMRA:
18    Q  Even if she was fearful, did you check
19 with Mr. Belafonte?
20    A  No, because that might have put her and
21 the kids in harm's way. Whether it was right or wrong,
22 I don't know. But she was fearful. That's my opinion.
23    Q  Wasn't Osiris in both of their names?
24    A  It is in both of their names.
25    Q  Didn't you have an equal duty to both



MICHAEL SOBELMAN
MARRIAGE OF BROWN AND BELAFONTE

Page 205

```
1  parties?
2         MR. WRIGHT:  Objection.  Calls for legal
3  conclusion.  He's not here to testify with respect to
4  duties or legal entities.
5  BY MS. JAMRA:
6         Q   As a CPA, they were both your clients,
7  weren't they?
8         A   Osiris was our client.
9         Q   And individually, you were preparing both
10 of their tax returns.  You were handling both of their
11 accounts; correct?
12        A   We resigned and Stephen knew we were
13 going to resign.  I told him we were going to need to
14 resign because of this.  We waited a few days mainly
15 until we got a lay of the land.  He knew we were going
16 to resign, that we had to.
17        Q   Did Stephen ever ask you to keep
18 transactions secret from Melanie?
19        A   I don't recall that.
20        Q   Did Stephen ever ask you to withhold
21 reports from Melanie?
22        A   I don't recall that.
23        Q   Did Stephen ask you to lie about
24 instructions he was giving you?
25        A   No.
```

Page 206

```
1         Q   Meaning to Melanie?
2         A   No.
3         Q   When the New York City condo sold, NYC
4  Props, that $300,000 profit, where did it go?  What bank
5  account?
```