**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

STEPHEN BELAFONTE,

      Plaintiff,

v.

MELANIE JANINE BROWN,

      Ms. Brown.

Case No. 1:24-cv-22045-DPG

<u>**FIRST AMENDED COMPLAINT**</u>

Plaintiff, STEPHEN BELAFONTE ("Mr. Belafonte" or "Stephen" or "Plaintiff"), by and through his undersigned counsel, hereby files this First Amended Complaint against Ms. Brown MELANIE JANINE BROWN ("Mel B" or "Ms. Brown"), and alleges the following:

**NATURE OF ACTION**

1.      One person is telling the truth.  The other person is lying.  For the last seven years, Ms. Brown has portrayed herself as a survivor of physical, sexual and financial abuse at the hands of her ex-husband, Mr. Belafonte.  Ms. Brown has been lying.  Mr. Belafonte never abused her physically or sexually.  Mr. Belafonte never exercised control over her finances.  Mr. Belafonte has brought this lawsuit because he is prepared to prove that he has been telling the truth about their relationship, and Ms. Brown has been lying.  Ms. Brown needs to stop.

2.      Physical, sexual and financial abuse in relationships – marriage or otherwise – is a serious problem.  There are thousands of victims who must be allowed to tell their stories and abusers who must be held accountable.  It is also true that there are people who have used false claims of domestic abuse as a launching pad for self-promotion.  Ms. Brown is one such individual.

1

Through her books, interviews, and articles, Ms. Brown has lied about her relationship with Mr. Belafonte to create a false public narrative – her as the victim, him as the abuser.  This false public narrative has made Ms. Brown even more rich and famous.  And it has broken Mr. Belafonte reputationally, emotionally, and financially.

3.      Nonetheless, Mr. Belafonte has long sought to avoid having to bring this lawsuit. Ms. Brown is a troubled person.  Their marriage was fraught with problems due to Ms. Brown's chronic drug and alcohol abuse.  Ms. Brown also had (and has) a long history of making scandalous, headline making accusations about people that are untethered to reality.  She has real problems that should be addressed.  But Mr. Belafonte's sympathies for Ms. Brown's personal demons can no longer prevent him from defending himself from her persistent lies about their relationship.  Mr. Belafonte must put this chapter of his life behind him, and that means holding Ms. Brown accountable for the lies that she had spread.

4.      In bringing this lawsuit, Mr. Belafonte is aware of the risk of pushing back against someone as famous and powerful as Ms. Brown.  He is likewise aware of the public relations concerns with declaring your innocence when faced with accusations of abuse.  Mr. Belafonte only is proceeding with this lawsuit because he knows one person is telling the truth and one person is lying.  The physical, sexual and financial abuse that Ms. Brown has repeatedly claimed took place during their marriage did not happen.  The accusations are demonstrably false, and Ms. Brown knows it.  That is defamation even when done by someone as famous and powerful as Ms. Brown.

## PARTIES

5.      Stephen Belafonte is an individual residing in Miami, Florida.  He is a film and television producer, director, and talent manager.  He was married to Ms. Brown in June 2007 and divorced from her in August 2018.  During their marriage, Mr. Belafonte pulled back from his own

career to focus on Ms. Brown's career and helped to arrange several of her high-profile engagements during their marriage. Mr. Belafonte and Ms. Brown had one child during their marriage, M.B. By court order, Mr. Belafonte has primary physical custody of M.B.

6.      Melanie Janine Brown is an individual residing in Leeds, United Kingdom. Ms. Brown is one of five members of the world-renowned Spice Girls. Formed in 1994, the Spice Girls are the best-selling girl group of all time, having sold 100 million records worldwide and amassed several high-profile awards in the music industry, including three American Music Awards, four Billboard Music Awards, five Brit Awards, three MTV Europe Music Awards, and one MTV Video Music Award.

7.      In connection with their divorce, and continuing for years following, Ms. Brown has publicly portrayed Mr. Belafonte as physically, sexually and financially abusive during their marriage. Ms. Brown has made these accusations in depositions, books, interviews, and articles. Ms. Brown's narrative about Mr. Belafonte is demonstrably false. Mr. Belafonte never physically or sexually abused Ms. Brown and he never controlled her finances.

**VENUE AND JURISDICTION**

8.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Mr. Belafonte is a resident of Florida, Ms. Brown is a resident of the United Kingdom, and the amount in controversy exceeds $75,000, exclusive of interests, costs, and attorneys' fees.

9.      Ms. Brown is subject to personal jurisdiction in the State of Florida pursuant to Fla. Stat. 48.193(1)(a)(2) because she committed intentional tortious acts within the State of Florida and the Court has supplemental jurisdiction with respect to the intentional torts committed outside of the State of Florida but had an effect and impact in the State of Florida.

10.     First, Ms. Brown committed the vast majority of the tortious acts against Mr.

Belafonte after July 2023, when Mr. Belafonte became a resident of the State of Florida. At the time of the publication of these defamatory statements, Mr. Belafonte was a resident and citizen of the State of Florida, a fact which Ms. Brown knew to be true at the time she published her defamatory statements.  Ms. Brown made her defamatory statements with the intent to harm a Florida resident with his neighbors and community in the State of Florida.

11.     Second, the defamatory statements were published in Florida and accessed by Florida residents.  Ms. Brown also had knowledge that her defamatory statements would be accessed by third parties within the State of Florida.  Ms. Brown also knew and intended to inflict harm upon Mr. Belafonte's reputation and business within the State of Florida through these defamatory statements.

12.     Third, on information and belief, in December 2022 or January 2023, Ms. Brown targeted her defamatory statements to Malu Trevejo, a musical artist residing in the State of Florida, with the intent of harming Mr. Belafonte.  Ms. Brown then directed social media messages towards Ms. Trevejo in Florida, expressing to her that "your story is my story; "this man must be stopped;" "standing up for ALL the women he exploits and STILL abuses, that's me included let's stand together and stop his #abuse" and ""Abusers won't ever stop until they are STOPPED I'm here standing with you".

13.     Fourth, on information and belief, Ms. Brown intended her defamatory statements to influence a resident of the State of Florida, M.B., Mr. Belafonte's and Ms. Brown's daughter. Mr. Belafonte has primary physical custody of M.B.  Ms. Brown intended for her defamatory statements about Mr. Belafonte to drive a wedge between M.B. and her father (Mr. Belafonte). Ms. Brown's defamatory statements did not just happen to impact residents of Florida.  Her motivation, in part, was to influence one resident in particular.

14.     Fifth, Ms. Brown maintains regular business contacts within the State of Florida. Ms. Brown conducted business in Florida as recently as September 18, 2024, when the company Zumba Fitness, with its principal place of business located in Hallandale, Florida, announced from Miami that it had entered a business partnership with Ms. Brown.

15.     Ms. Brown, through her actions, reasonably anticipated being brought into court in the State of Florida, and therefore this Court's jurisdiction over Ms. Brown comports with traditional notions of fair play and substantial justice.  Ms. Brown has engaged in a pattern of making defamatory statements about a Florida resident with the intention of her statements being heard and read by Florida residents and with the intention of injuring the reputation of a Florida resident.  Ms. Brown did not take any steps to limit the dissemination or publication of her defamatory statements to individuals outside of the State of Florida.

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to this action occurred in Miami-Dade County, Florida; Mr. Belafonte is a resident of Miami-Dade County, Florida; and Mr. Belafonte, through Ms. Brown's actions, suffered harm to his reputation in Miami-Dade County, Florida.

## FACTUAL ALLEGATIONS

17.     Mr. Belafonte and Ms. Brown had a tumultuous marriage, which ended poorly. That is not unusual, especially with someone as rich and famous as Ms. Brown.  But what was unusual was Ms. Brown's decision to turn a private divorce into a platform to spread a false narrative about Mr. Belafonte.  This false narrative served to heighten her fame, conceal her drug and alcohol abuse, and portray Mr. Belafonte as an abuser.

**I.      Mr. Belafonte and Ms. Brown had a tumultuous marriage rocked by Ms. Brown's drug and alcohol abuse.**

18.     Ms. Brown and Mr. Belafonte began dating in 2006.  The couple married on June

6, 2007, in Las Vegas.  Ms. Brown gave birth to M.B. in 2011.  Prior to their marriage, Mr. Belafonte had one daughter by a previous relationship, and Ms. Brown had two daughters, one by a previous marriage, and the second by Eddie Murphy, the actor and comedian, whom Ms. Brown dated for approximately three or four months.

19.     Throughout their marriage, Mr. Belafonte pulled back from his own career as a film and TV producer and instead focused on assisting with Ms. Brown's career by serving as her manager and landing her business deals and various engagements, including Dancing with the Stars, the reality show "Mel B: It's a Scary World," and scores of endorsements, appearances and partnerships.

20.     Ms. Brown controlled the money and finances that were earned during the marriage as well as the money and finances she earned before the marriage, of which there was very little. Despite having earned many tens of millions as a Spice Girl, Ms. Brown entered into the marriage with only $300,000.  The family had an accountant to manage spending.  Ms. Brown, however, had ultimate control and required notification from her accountant for all expenditures over $5,000. Thus, even though Mr. Belafonte assisted Ms. Brown with her career and career opportunities, the money and finances earned through those endeavors were paid to Ms. Brown, rightfully so, and controlled by Ms. Brown.

A.     **Ms. Brown's substance abuse problems turned her against Mr. Belafonte.**

21.     Unfortunately, the couple's marriage was heavily impacted by Ms. Brown's substance abuse problem, which included the abuse of cocaine, alcohol, and prescription drugs such as antidepressants, propranolol, hydrocodone, zolpidem and valium, as well as dangerous combinations of those drugs with alcohol.  For much of their marriage, Mr. Belafonte was deeply concerned for Ms. Brown's health and wellbeing, as well as the health and wellbeing of their children, who witnessed their mother's extreme intoxication many times.

6

22.     Over the years, Mr. Belafonte would beg and plead with Ms. Brown to stay sober. Mr. Belafonte often feared for her life and expressed his fears to her and their family therapist.  Mr. Belafonte implored Ms. Brown to seek help in connection with her rampant alcohol and drug abuse.  This led to anger, resentment, and ultimately fury on the part of Ms. Brown.  Often, while under the influence of drugs or alcohol, Ms. Brown would make up false stories and blame Mr. Belafonte for her behavior, making him the enemy because he would confront her about her drunken and intoxicated episodes.

23.     Ms. Brown's intoxication episodes grew so frequent and so out of control, and she would deny her behavior so often, that Mr. Belafonte took a handful of videos of Ms. Brown acting out violently or inappropriately, such as when she terrified her children because she had become unresponsive and appeared dead in front of them; or when she tried to "pound" vodka shots with her teen daughter, or when, after doing large quantities of cocaine, she left their London apartment in the middle of the night in her pajamas to get a glass of wine.

24.     Mr. Belafonte also described such incidents to the family's therapist, since Ms. Brown would deny they took place.  He wanted the therapist to stop prescribing drugs for Ms. Brown, fearing that the combination of such drugs with alcohol and cocaine would kill her.  Mr. Belafonte never shared any of these videos publicly.  But despite Mr. Belafonte's intentions, Ms. Brown turned his acts against him, publicly and falsely charging him with taking and sharing illegal "revenge porn"-type videos.

25.     As often happens, sadly, Ms. Brown's drug and alcohol addictions continued to spiral.  In October of 2014, Ms. Brown took 200 aspirin pills in London.  Mr. Belafonte called poison control and the ambulance, which Ms. Brown refused to take.  She went into her child's bedroom and locked the door.  She eventually went to the hospital the next morning and was there

for a week.

26.     What Ms. Brown did next was another sign of what was to come.  She appeared on the television show The X Factor with visible bruises from her hospital treatment and no wedding ring.  By doing so, specifically taking off her wedding ring for the appearance, Ms. Brown implied and allowed the world to believe that the bruises were caused by Mr. Belafonte.  Ms. Brown's actions subjected Mr. Belafonte to press reports that he was a wife abuser, as well as a police investigation, which, of course, found no evidence of abuse.

**B.     Ms. Brown instigated and controlled sexual relationships with other women during their marriage and continued her substance abuse.**

27.     Ms. Brown also had a voracious sexual appetite and would frequently ask Mr. Belafonte to engage in group sex with her and other females which she controlled, directed, and sometimes recorded.  On multiple occasions she shared such recordings with third parties without Mr. Belafonte's consent.  Mr. Belafonte was forwarded and currently holds a copy of one such message disseminating a private video, which demonstrates that it was Ms. Brown who controlled the sexual aspect of their relationship.

28.     For example, Ms. Brown instigated a sexual relationship with Lorraine Gilles, the woman hired as a nanny for their family.  Ms. Brown had an ongoing sexual relationship with Ms. Gilles over the course of seven years, which, at Ms. Brown's direction, sometimes involved Mr. Belafonte.  Ms. Brown orchestrated sexual activities with her employee throughout that time and often acted as camerawoman.  An avid fan of tattoos proclaiming relationships, Ms. Brown also coerced Ms. Gilles to get a tattoo on her private parts, implying that Ms. Gilles would not keep her job if she did not comply.  The tattoo said:

*Owned by*
*Mel*
*Stephen*

Ms. Gilles was only 19 years old at the time.

29.     As time went on, Ms. Brown grew to treat Mr. Belafonte with ever greater disdain and contempt, particularly when he tried to get her to stop her from overconsuming alcohol and drugs.  Ms. Brown lashed out at him, calling him "fat," a "whale," a "little bitch," a "fat fuck," a "loser", a "fat fucking loser," "disgusting" and made fun of the fact that he had lupus, a painful and debilitating disease.  Mr. Belafonte would repeatedly implore her to not be cruel.  Mr. Belafonte was in terrible emotional pain during this time, often telling Ms. Brown how much she hurt him and pleading with her to not express such hatred towards him.

30.     Ms. Brown, however, remained in control of the relationship.  It was she who decided whether the couple would have a good day or a bad day, and that often depended on her sobriety.  Towards the end of the relationship, as Mr. Belafonte grew more despondent over Ms. Brown's treatment of him, Mr. Belafonte and Ms. Gilles bonded over their shared experience of living in Ms. Brown's household, and they became close friends.  This fact, along with Mr. Belafonte's continued pleas for his wife to break her addictions and his stated fears that she could not properly look after her children, took Ms. Brown's fury towards Mr. Belafonte to new levels.

31.     Finally, Ms. Brown and Mr. Belafonte decided that they would be better off apart and that they would get a divorce.  They consulted their family therapist on the issue and told their children together.  All seemed to be going as expected in such an unfortunate situation, but it was not to last.

## II.     Ms. Brown lied about Mr. Belafonte during their divorce proceedings, evidencing her willingness to make false accusations even under oath.

32.     Ms. Brown continued her pattern of behavior, and exercising control over their relationship, during the divorce proceedings.  Mr. Belafonte discusses her actions during the divorce proceedings because they provide context for the defamation at issue in this case.  Her

actions also show a pattern and practice of lying and lying to inflict harm on Mr. Belafonte.

### A.   Ms. Brown committed perjury in her TRO declaration.

33.     Given that she had all the money and power, Brown launched divorce proceedings by applying for a temporary restraining order against Mr. Belafonte and submitting a declaration in support (the "TRO Declaration").  Mr. Belatone was never given notice of the TRO request at the time it was submitted; and it was filed in a manner so that he could not reply before it was considered by the Court.  Ms. Brown lied in her TRO Declaration.  For example:

34.     One, Ms. Brown claimed that the bruises she suffered in 2014 were caused by Mr. Belafonte's physical abuse.  That was not true.  It never happened.  In fact, Mr. Belafonte sought Ms. Brown's hospital records during the divorce proceeding, since they would have shown that there was no abuse, and the parties spent hundreds of thousands of dollars litigating the matter.  Ms. Brown adamantly refused to release the records, even for the court's eyes only, and she eventually withdrew her TRO allegations in their entirety.

35.     Two, Ms. Brown falsely claimed that Mr. Belafonte kept guns in the home, which would potentially endanger their children.  That was not true.  Mr. Belafonte did not keep guns in their home.  Moreover, Ms. Brown's false claim resulted in the ATF coming to their home to search for the alleged guns.  On information and belief, Ms. Brown called the tabloid news outlet TMZ to come to the house at the same time as ATF, which placed Mr. Belafonte in handcuffs as they searched the home.  They found nothing and Mr. Belafonte was released.

36.     Three, Ms. Brown claimed that in July 2012, while they were in New York for an X Factor taping with the recording artist Usher, Mr. Belafonte punched her in the face with a closed fist, causing her lip to split and swell.  That was factually inaccurate.  It never happened.  Multiple photographs from that day—July 25, 2012—show no sign of injury.  For example:

**Usher for X Factor Australia**

On set with Usher



\* \* \*



appears she isn't the only star he counts as a pal.



**Famous friends: Mel B was spotted leaving a New York restaurant with husband Stephen Belafonte (L) and Kim Kardashian's best friend Jonathan Cheban (R)**

11

37.     Four, Ms. Brown claimed that in August 2012, Mr. Belafonte punched her in the face with a closed fist and pushed her onto a carpet, causing rug burns.  That was not true.  It never happened. In reality, Ms. Brown had fallen in her 7-inch heels while intoxicated, saying at the time: "I wish I'd seen the security footage because I bounced off the wall, slid down it, then ate the floor" and "I've never done that before, ever, ever, ever, it was so embarrassing.  I thought I'd broken my jaw, then I thought I'd never be able to talk again, wondering if it would go back to normal."

38.     Ms. Brown made the false accusations in the TRO to harm Mr. Belafonte – a course of conduct that continues today.  News of Ms. Brown's accusations, which were false, exploded in the tabloid press and in the mainstream news media. including, but not limited to, TMZ, Page Six, Entertainment Tonight, Daily Mail, The Sun, and Us Weekly.

39.     Given the severity of Ms. Brown's allegations and the fact that the TRO was filed without notice to Mr. Belafonte, depriving him of the opportunity to defend himself, the judge granted Ms. Brown's application for the restraining order.  This resulted in Mr. Belafonte's removal from their marital home, as well as a court order preventing Mr. Belafonte from seeing or contacting M.B.

**B.     Ms. Brown committed perjury during her deposition.**

40.     Ms. Brown's lying reached a fever pitch during the divorce proceeding depositions, where under oath she told outrageous lies about Mr. Belafonte and third parties.  For example:

41.     One, Ms. Brown testified that Mr. Belafonte drugged and raped her constantly throughout the entirety of the marriage. That is not true.  Mr. Belafonte never drugged Ms. Brown.  Ms. Brown had a significant substance abuse problem.  Her drinking and drug use was objected to by people who loved her.  And Mr. Belafonte never raped Ms. Brown.  Their sexual activities were consensual, and Ms. Brown controlled their sexual relationship, with each other and with others.

42.     Two, Ms. Brown testified that Mr. Belafonte choked, strangled, beat, and punched her many, many times throughout the marriage—"constantly," from the very beginning of the marriage. That is not true.  Mr. Belafonte never choked, strangled, beat or punched Ms. Brown. Ms. Brown has never provided any evidence (pictures or otherwise) of any physical abuse from Mr. Belafonte and cannot provide any such evidence because it did not happen.

43.     Three, Ms. Brown testified that she was forced to have sex with the nanny, Ms. Gilles, over a years-long period.  That is not true. Ms. Brown controlled the many sexual encounters she had with Ms. Gilles, which were at times just Ms. Gilles and Ms. Brown, and at times included Mr. Belafonte, but were always consensual. As late as 2016, Ms. Brown had recorded intimate moments involving the three of them, saying "I like it."  Mr. Belafonte has a copy of this recorded incident, which he received after Ms. Brown illegally shared it with third parties.

44.     Four, Ms. Brown testified that Mr. Belafonte wanted to have a baby with Ms. Gilles, and when Ms. Brown refused, Mr. Belafonte strangled her, punched her in the face, and choked her.  That is not true.  Mr. Belafonte never wanted to have a baby with Ms. Gilles and never strangled, punched, or choked Ms. Brown.  Ms. Brown has never provided any evidence (pictures or otherwise) of any physical abuse from Mr. Belafonte and cannot provide any such evidence because it did not happen.

45.     Five, Ms. Brown testified that Ms. Gilles drugged her at least 15 times.  That is not true.  Ms. Brown had a significant substance abuse problem.  Her drinking and drug use was objected to by people who loved her.

46.     Six, Ms. Brown testified that Mr. Belafonte had "sex bunkers" where he trafficked women. She testified that Mr. Belafonte forced her to have sex with women from all over Europe.

And she testified Mr. Belafonte drugged and raped those women as well as her. None of that is true. Mr. Belafonte did not have a "sex bunker," did not traffic women, did not force Ms. Brown to have sex with women, and did not drug or rape the fictional women in the fictional sex bunker. Ms. Brown fabricated it all; and now, years later, has not (and cannot) provided any proof of what she claimed happened in the fictional sex bunkers.

47.     Moreover, demonstrating her vindictiveness and the length to which she would go to harm Mr. Belafonte, Ms. Brown filed a police report in Los Angeles claiming that Mr. Belafonte was a sex trafficker who was holding women in sex bunkers and that Mr. Belafonte anally and vaginally raped Ms. Brown over 150 times. Her claims were investigated by the Los Angeles police, the district attorney, the ATF, and the FBI, who found that Ms. Brown's allegations were not credible, and the case was closed.

48.     Seven, Ms. Brown testified under oath that Mr. Belafonte secretly funneled over $10 million out of the couple's joint account into an account that he controlled. That is not true. Mr. Belafonte did not funnel money out of a joint account. It was Ms. Brown who removed all the money from that account at the start of the divorce proceedings, leaving Mr. Belafonte with nothing. The family had an accountant who oversaw spending and Ms. Brown was notified of expenditures over $5,000. Ms. Brown controlled the money, not Mr. Belafonte.

49.     Indeed, the evidence associated with the divorce proceeding rebutted Ms. Brown's false claims, even though she tried to prevent that testimony from being provided. There was a limit to what she could manipulate with her money and power. For example:

    a.     Ms. Brown tried, and failed, to prevent one witness from testifying that Ms. Brown's allegations of abuse were false and that it was Ms. Brown who orchestrated sexual encounters with third parties.

14

b. Ms. Brown also tried to get one of the women who the couple were sexually intimate with to testify that Mr. Belafonte raped her. Instead, the woman submitted a statement to the family court detailing that her sexual encounters with Ms. Brown and Mr. Belafonte was consensual, that Mr. Belafonte had not raped or otherwise sexually assaulted her, that Ms. Brown had contacted her and requested that she lie about Mr. Belafonte, and that she had refused that request.

c. Ms. Brown also pressured her friend and employee Gary Madatyan to lie during the divorce proceedings and claim that Mr. Belafonte was abusive, but Mr. Madatyan refused.

**C. The family court rejected Ms. Brown's lies and has continued to see through Ms. Brown's lies.**

50. Fortunately, because Ms. Brown had no evidence to support her false accusations about Mr. Belafonte, Ms. Brown was forced to withdraw them, and the TRO that was entered based on her lies was dissolved. Ms. Brown was ordered to pay Mr. Belafonte approximately $500,000. The couple's divorce was settled in 2017 and finalized in 2018.

51. In September of 2018, the parties were back in court due to Ms. Brown's drug and alcohol use around her children. On September 4, 2018, the court entered the following order:

> Pursuant to Family Code Section 3041.5, [Ms. Brown] is ordered to undergo testing for the use of controlled substances/alcohol. Based on the Evidence presented, the Court finds that there is a habitual, frequent, and continuous use of controlled substances/alcohol by [Ms. Brown].

The court further ordered that Ms. Brown could not be alone with her child. The nanny had to be present whenever M.B. was in the care of Ms. Brown.

52. In early 2019, Mr. Belafonte was awarded primary physical custody of M.B.

53.     Unfortunately, that did not end the need for Court intervention.  For example, in December 2019, after M.B. told Mr. Belafonte that Ms. Brown had been extremely intoxicated during a custodial visit and M.B. feared for her safety, Mr. Belafonte sought an order in family court to allow M.B. to remain in Los Angeles rather than travel to the United Kingdom to visit Ms. Brown for Christmas. The court found good cause to grant the order, citing the potential of putting M.B. in harm's way if she were to go to the UK for Christmas.

54.     And in December 2022, the court again needed to address Ms. Brown's addictive and harmful behavior around her children, including her being intoxicated around them and climbing into bed with them naked.  The court entered an order stating, in part, as follows:

> [Ms. Brown] shall not be under the influence of alcohol or other substance which substantially impairs her ability to care for [M.B.] when [Ms. Brown] is responsible for the health and safety of [M.B.] during her custodial period with [M.B.], and eight (8) hours immediately preceding that time. [Ms. Brown] shall not expose or present herself naked in [M.B.'s] presence, including but not limited to, entering [M.B.'s] bathtub, walking around her without underwear, or attempting to sleep in the same bed naked with [M.B.].

It is a remarkable moment when a court needs to remind a parent, Ms. Brown, that they should not be under the influence of alcohol or other substances when around their 11-year-old child and should not get into bed or the bathtub naked with her.  But that is what the court said to Ms. Brown. The court made no such proclamations about Mr. Belafonte.

55.     Ms. Brown's troubling behavior continued.  In 2023, Ms. Brown and Mr. Belafonte had a custody battle over M.B. when Ms. Brown sought to take M.B. to live with her in London. The court rejected her request. And in 2024, Mr. Belafonte escorted M.B. to the U.K. in 2024 to see her mother, Ms. Brown. Mr. Belafonte remained in London for business meetings, and on the day he was to leave, a process server attempted to serve a Non-Molestation Order on him. This was because Ms. Brown had filed yet another declaration replete with falsehoods regarding fears for her safety, without notice to Mr. Belafonte.  After Mr. Belafonte filed his own declaration

setting forth the truth, Ms. Brown voluntarily withdrew her application for the Non-Molestation Order, and Mr. Belafonte was awarded his costs.  On information and belief, Ms. Brown also told the Sun newspaper that Mr. Belafonte faced being questioned by the police regarding her claims of harassment; that Mr. Belafonte beat her during their marriage; and that she had gotten a restraining order against him in the United States.  The Sun then published a story containing these false allegations on June 27, 2024 under the headline *"Mel's Pain – Mel B's ex-husband Stephen Belafonte faces being questioned by UK police over harassment claims made by her."*

> **D.      Ms. Brown had to settle a defamation lawsuit based on the lies she made during the divorce proceedings.**

56.      Ms. Brown's lying during the divorce proceedings came back to haunt her when Ms. Gilles sued Ms. Brown for defamation. *See Lorraine Gilles v. Melanie Brown*, California Superior Court (Los Angeles County) Case No. BC658783 (Filed April 20, 2017).

57.      The defamatory statements in that action included Ms. Brown's public statements that Mr. Belafonte was having an extramarital affair with Ms. Gilles, got Ms. Gilles pregnant, and coerced Ms. Brown into nonconsensual sex with Ms. Gilles. In fact, it was Ms. Brown that had an intimate relationship with Ms. Gilles for nearly the entire seven years of Ms. Gilles' employment, which Ms. Brown controlled—and Ms. Brown later admitted that her accusations regarding the affair between Ms. Gilles and Mr. Belafonte were false.

58.      Ms. Brown's attempt to dismiss Ms. Gilles' lawsuit on anti-SLAPP grounds was unsuccessful, and the denial of her motion was affirmed on appeal because the reviewing court found that Ms. Gilles' lawsuit was rightfully filed. In 2019, Ms. Brown paid Ms. Gilles over $2.3 million to settle the lawsuit.

> **E.      Ms. Brown continued to lie about people who expressed concern over her dangerous behaviors after the divorce.**

59.      Post-divorce settlement, Ms. Brown's drinking and drug consumption continued to

be so extreme that those around her expressed serious alarm.  Even Ms. Brown's family members in the U.K. expressed concern from abroad over her mental health issues, sexual partners, alcoholism and harm to her children.

60. True to form, Ms. Brown lied and retaliated against individuals who shared their concern with her and with others.

61. In 2018, (now former) nanny Rusty Updegraff confronted Ms. Brown about her heavy drinking, sexual relationships with strangers who frequented her home multiple times each day, her children's witnessing of sex acts, her cocaine use, and abuse and neglect of her children while intoxicated. He also filed a declaration in the family court proceedings between Ms. Brown and Mr. Belafonte, where he stated that he feared for M.B.'s safety and wellbeing due to these issues.

62. Ms. Brown responded by falsely accusing Mr. Updegraff of raping children, implying they were her own children. Ms. Brown made these false accusations to several third parties who knew Mr. Updegraff personally. Ms. Brown also lied that there had been a police investigation in connection with these alleged sexual assaults, even though there was no such investigation and no police report had been filed.

63. Ms. Brown was more interested in discrediting Mr. Updegraff to members of the community than the emotional harm she would be causing her children and family by spinning false sexual assault accusations involving them.

64. Ms. Brown was also sued in 2019 by an employee and longtime friend of hers, Gary Madatyan, who had angered Ms. Brown by expressing his concern regarding her rampant drug and alcohol abuse and the emotional abuse she was inflicting on her children. *See Poghos Karen "Gary" Madatyan v. Melanie Brown*, California Superior Court (Los Angeles County), Case No.

19STCV34181.

65.     Mr. Madatyan alleged, among other claims, that Ms. Brown had engaged in abusive behavior towards Mr. Madatyan and stole money from him. He also said that he had been pressured by Ms. Brown, as well as her therapist, to lie during the divorce proceedings and claim that Mr. Belafonte was abusive, but Mr. Madatyan refused. Upon information and belief, Mr. Madatyan and Ms. Brown settled this dispute for an undisclosed sum.

**III.    Ms. Brown used her lies about Mr. Belafonte to become the face of domestic abuse.**

66.     Having lost her battle against Mr. Belafonte in family court, Ms. Brown decided to spin a false narrative about Mr. Belafonte in the court of public opinion, knowing that the public would be sympathetic toward her given her large fanbase and status as an internationally renowned celebrity.

67.     Ms. Brown leveraged her celebrity status to portray herself as a domestic abuse victim to market and sell a memoir laden with lies. The memoir, ironically titled *Brutally Honest*, was published in 2018.  In it, she created a false narrative of her marriage with Mr. Belafonte.

68.     This has enabled Ms. Brown to build herself a new career and enrich herself at the expense of Mr. Belafonte's reputation and emotional wellbeing.  Since reinventing herself as spokesperson for abuse victims, Ms. Brown has turned her lies into a full-blown career as a charity ambassador for Women's Aid, a UK-based organization for women escaping domestic violence.

69.     For example, as part of the scheme to portray Mr. Belafonte as a malevolent spouse, Ms. Brown appeared in a "public service" style, domestic violence awareness video in 2021, in which she is beaten "bloody" by an actor not unlike Mr. Belafonte in appearance. The video has garnered 1.3 million views.

70.     Ms. Brown then wrote an article appearing in the U.S. Sun entitled "NOT MY FAULT Abuse Trauma can last a lifetime. Five years later, I am still waking up covered in shame,

sweat and fear, say Mel B." The article accuses Mr. Belafonte of physical abuse. On information

and belief, since she was the author of the article, Ms. Brown also chose the picture to accompany

the headline, which was from the domestic violence video she made and not any physical abuse

by Mr. Belafonte:

***NOT MY FAULT Abuse Trauma can last a lifetime. Five years later, I am still waking up covered
in shame, sweat and fear, say Mel B.***



71.     This is a remarkable bit of public manipulation and deception.  Ms. Brown used a

staged photograph bearing no connection to reality to (1) portray herself as a victim of physical

abuse and (2) portray Mr. Belafonte as the abuser.  It is a fake picture, relying on make-up and

styled hair to depict an abuse survivor.  But it was used to make Ms. Brown the face of domestic

abuse, and Mr. Belafonte the abuser.  Shameful.  Notably, the Sun took down the offending

photograph, and it no longer appears on the publication's website.

72.     Domestic abuse of women (and men) around the world is a serious and dangerous

situation. The cause to eradicate it needs champions and voices and support.  Ms. Brown used a

doctored photo and false accusations to thrust herself into the discussion.  Any work that Ms.

Brown does to help victims of domestic abuse should be applauded but her efforts to defame Mr.

Belafonte in the process is shameful.  She does a disservice to the women and men who are actual victims of domestic abuse by lying about her marriage.

**IV.    Ms. Brown engaged in a disinformation campaign to label Mr. Belafonte a domestic abuser and herself as a victim.**

73.    Ms. Brown has spent the last several years attempting to change her narrative from someone who suffered from alcohol and substance addiction to a victim of domestic abuse. She may believe that her fame and fortune give her permission to lie about others.  She may believe that her false status as a victim of domestic abuse will raise her profile and allow her even more money and fame.  But one of the victims of her lies is Mr. Belafonte.  She needs to stop.  Continue to do work for a cause that needs support but stop lying about Mr. Belafonte.  Let him have his life back.

**A.    Ms. Brown lied about Mr. Belafonte prior to republishing her book.**

74.    Ms. Brown's disinformation about Mr. Belafonte has taken place – on and off – since their divorce.  Her last campaign, the subject of this lawsuit, started in January 2023 with a publicity tour preceding the publication of a new version of her book.

75.    ***Defamatory Publication No. 1/False Statement 1 (Ex. 1).***  On January 18, 2023, at an appearance on "LIVE with Kelly and Ryan," Ms. Brown stated as follows: "Your confidence is on the floor—put aside that, the physical abuse, the coercive control, the financial control, I was left just in bits and pieces."  (https://www.youtube.com/watch?v=oWQLQMLezXw>).
The context surrounding Ms. Brown's statement made clear to a reasonable listener that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who heard the statements understood she was referring to Mr. Belafonte.

76.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown nor did he

have any financial control over her.  Ms. Brown has made these accusations in the past.  Ms. Brown

has never provided any evidence (tangible or otherwise) to support the accusations or third-party

support for the accusations.

77.     ***Defamatory Publication No. 2/False Statement No. 2 (Ex. 2).***  In January of 2023,

Ms. Brown appeared on the reality show Special Forces. In the premier episode, she said she

"ended up being in a very horrible abusive 10-year marriage." In a January 21, 2023 Daily Beast

article about her experience and motivations for appearing on the show, Ms. Brown told the news

outlet: "During that marriage, I suffered a lot of abuse on every single level."

(https://www.thedailybeast.com/special-forces-helped-mel-b-heal-from-an-abusive-marriage):



The context surrounding Ms. Brown's statement made clear to a reasonable listener that she was

referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who

heard the statements understood she was referring to Mr. Belafonte.

78.     Ms. Brown's statement and implication about Mr. Belafonte were factually

inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown nor did he have any financial control over her.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

79.     ***Defamatory Publication No. 3/False Statement No. 3 (Ex. 3).***  On November 7, 2023, at an appearance on Howie Mandel's podcast, "Howie Mandel Does Stuff," Episode No. 146, in response to Mr. Mandel's question as to whether she "came really close to death," Ms. Brown responded, "oh yeah, many times, at the hands of my abuser," and that the children "witnessed it [the purported physical abuse] many times." (https://www.youtube.com/watch?v=E7cfobPFjyg)

The context surrounding Ms. Brown's statement made clear to a reasonable listener that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who heard the statements understood she was referring to Mr. Belafonte.

80.     Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusation or third-party support for the accusation.  It is shameful that Ms. Brown would lie about the experiences of her/their children.

81.     ***Defamatory Publication No. 4/False Statement No. 4 (Ex. 4).***  On a March 2, 2024 interview with BBC, Ms. Brown stated, "I'm not allowed to have a credit card.  I'm not allowed to drive" and "If I'm going to report that I've been badly physically abused" and, regarding her appearance with bruises on the X Factor: "This has to stop.  Look what you've done to me." (https://www.youtube.com/watch?v=kCI2yTB6OkU)

23

The context surrounding Ms. Brown's statement made clear to a reasonable listener that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who heard the statements understood she was referring to Mr. Belafonte.

82.     Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown nor did he have any financial control over her.  Ms. Brown had credit cards (easy to prove with credit card statements) and drove whenever she wanted to do so (easy to prove with gas charges and statements). Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

83.     ***Defamatory Publication No. 5/False Statement No. 5.***  Ms. Brown also disparaged Mr. Belafonte outside of her television appearances to individuals.  One such person is the recording artist Malu Trevejo, who Mr. Belafonte managed, who is based in Miami.  On information and belief, Ms. Brown reached out to Ms. Trevejo in early 2023, repeating the defamatory statements that are the subject of this lawsuit, including that Mr. Belafonte had financial control over Ms. Brown. Ms. Trevejo then sued Mr. Belafonte, echoing claims of financial abuse.

84.     Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown nor did he have any financial control over her.   Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

85.     ***Defamatory Publication No. 6/False Statement No. 6 (Ex. 5).***  Ms. Brown then

publicized the lawsuit on her social media, sharing a screenshot of the court case with the caption "@malutrevejo your story is my story and I'm still living threw [sic] it." "This man must be stopped."



The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

86.     Ms. Brown further posted: "@malutrevejo standing up for ALL the women he exploits and STILL abuses, that's me included let's stand strong together and stop his #abuse" and

"Abusers won't ever stop until they are STOPPED I'm here standing with you @malutrevejo"

* * *



* * *



The context surrounding Ms. Brown's statements made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

87.   Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown nor did he have any financial control over her.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party

support for the accusations.

**B.     Ms. Brown published a new edition of her book with lies about Mr. Belafonte.**

88.     Mr. Belafonte has tried to move on with his life for the sake of his children.   But

the lies continued.  In March of 2024, Ms. Brown issued a new addition of *Brutally Honest*.



89.     The book has a new title: *Brutally Honest: The Sunday Times Bestseller*.  It includes

additional material, including 3 new chapters.  And the 2024 edition has a distinct International

Standard Book Number (ISBN) from the 2018 edition: the ISBN number for the 2018 edition is

ISBN 9781787133525, whereas the ISBN number for the 2024 edition is ISBN 9780755310630.

90.     Tellingly, there are no specific incidents in the book to back up the wild claims

made by Ms. Brown when she perjured herself during her divorce proceedings, namely that Mr.

Belafonte regularly drugged, beat, and raped her throughout the entirety of their 10-year marriage

and stole $10 million from her.

91.     ***Defamatory Publication No. 7 (Ex. 6).***   And yet the book is full of false and

defamatory statements stating and implying that Mr. Belafonte was a violent abuser who controlled Ms. Brown's finances and sexually extorted and exploited her.  The following are examples of the defamatory statements and implications made by Ms. Brown.

92.     ***False Statement No. 7.***  "I know what it's like to be beaten down.  I know what it's like to be punched, humiliated and isolated, and to feel there is no way out except suicide." The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

93.     Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown.  He did not punch her or beat her down.  He did not isolate her. Ms. Brown has made the accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

94.     ***False Statement No. 8.*** "I can't pretend I'm not living in some twisted, violent hell." The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

95.     Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown.  Ms. Brown was not living in a violent home.  There was no violence by Mr. Belafonte directed towards Ms. Brown.  Ms. Brown has made the accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

96.   ***False Statement No. 9.*** "I was exhausted, worn down by seven years of what felt to me like constant emotional abuse, mind games, degradation, threats and sexual exploitation."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

97.   Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not sexually abuse Ms. Brown.  Ms. Brown and Mr. Belafonte had consensual sex and Ms. Brown controlled their sexual relationships with other women.  There was no violence by Mr. Belafonte directed towards Ms. Brown.  Ms. Brown has made the accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

98.   ***False Statement No. 10.***   "He was the one that decided where I lived, who I saw (unless I was working), what my money was spent on, who looked after our kids (not me but a selection of nannies or members of his family)."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

99.   Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not have any financial control over Ms. Brown.  Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown.  Mr. Belafonte did not control where the family lived (third party real estate agent can confirm), he did not control where she spent money (credit card statements will confirm), and he did not control who watched the children (she

hired Ms. Gilles, among others).  Ms. Brown has made these accusations in the past.  Ms. Brown

has never provided any evidence (tangible or otherwise) to support the accusations or third-party

support for the accusations.

100.    ***False Statement No. 11.*** **"**He controlled my bank accounts and my work

schedule." The context surrounding Ms. Brown's statement made clear to a reasonable reader that

she was referring to Mr. Belafonte as the cause of her situation and, on information and belief,

people who read the statements understood she was referring to Mr. Belafonte.

101.    Ms. Brown's statement and implication about Mr. Belafonte were factually

inaccurate and demonstrably false.  Mr. Belafonte did not have any financial control over Ms.

Brown.  Ms. Brown had control over her bank accounts and the family had an accountant who

oversaw spending, with notifications going to Ms. Brown.  Ms. Brown has made these accusations

in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the

accusations or third-party support for the accusations.

102.    ***False Statement No. 12.***  "But he's got all these videos of me.  Really bad videos.

He could ruin me." The context surrounding Ms. Brown's statement made clear to a reasonable

reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and

belief, people who read the statements understood she was referring to Mr. Belafonte.

103.    Ms. Brown's statement and implication about Mr. Belafonte were factually

inaccurate.  Mr. Belafonte has never threatened to publicize Ms. Brown's videos or otherwise

extort Ms. Brown over videos.  Ms. Brown orchestrated and controlled the making of certain

videos involving consensual sexual encounters.  Those were choices made by Ms. Brown.

104.    ***False Statement No. 13.***  **"**Stephen could trump any PR or lawyer by simply

leaking any one of the tapes from his sex-tape library." The context surrounding Ms. Brown's

statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

105.   Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate.  Mr. Belafonte has never threatened to publicize Ms. Brown's videos or otherwise extort Ms. Brown over videos.  Ms. Brown orchestrated and controlled the making of certain videos involving consensual sexual encounters.  Those were choices made by Ms. Brown.

106.   **_False Statement No. 14._**  **"I never wanted people to know anything, but news of my horrific marriage came out because in Los Angeles I felt I needed to file court papers to get a temporary restraining order on Stephen to protect myself and my girls."**  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

107.   Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.  Ms. Brown has made these accusations in the past.  Moreover, Ms. Brown omitted that the temporary restraining order was dissolved, and she committed perjury in the declaration in support of the temporary restraining order.

108.   **_False Statement No. 15._**  "The outrageous, funny Mel B they all thought they knew was actually a woman who'd had to go to court to get away from her husband, a woman who feared for her own safety."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on

information and belief, people who read the statements understood she was referring to Mr. Belafonte.

109.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.  Moreover, Ms. Brown omitted that the temporary restraining order was dissolved, and she committed perjury in the declaration in support of the temporary restraining order.

110.    ***False Statement No. 16.***  "But as the makeup artist carefully applied layer after layer of foundation to my face and body to cover the bruises, I felt myself getting more and more angry."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

111.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Notably, Ms. Brown's story regarding her X Factor appearance has continued to change: what she said at the time of the incident, what she said in her TRO Declaration, and what she said in *Brutally Honest* are all different. Mr. Belafonte did not physically abuse Ms. Brown.  No one ever covered up bruises on Ms. Brown caused by Mr. Belafonte.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

112.    ***False Statement No. 17.***  "I knew the bruises were still visible as I put on a beautiful, long white silk dress, semi-sheer at the top then hugging every curve of my body. It had to be a white dress."  The context surrounding Ms. Brown's statement made clear to a

reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

113.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown.  No one ever covered up bruises on Ms. Brown caused by Mr. Belafonte.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

114.    **_False Statement No. 18._** "I would stand proud in this stunning white dress, with the marks of my agony all over me.  I asked for my hair to be pulled right back from my face; I needed to be seen.  I needed all those bruises to be seen."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

115.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown.  No one ever covered up bruises on Ms. Brown caused by Mr. Belafonte.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

116.    **_False Statement No. 19._** _"_PC Cunningham was not stupid.  He took in the bruises, he put together some of the garbled half-sentences, gauged my fear and anxiety." The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who

read the statements understood she was referring to Mr. Belafonte.

117.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown.  No one ever covered up bruises on Ms. Brown caused by Mr. Belafonte.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

118.    *False Statement No. 20.*  "Melanie, go and get the gun." The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

119.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not own a gun, did not have a gun in the house, and did not order Ms. Brown to get a gun.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

120.    *False Statement No. 21.*  "A lady from Freemantle (the company that produces The X Factor) was contacted and eventually we got the codes to the bank account where my fees were to be deposited.  It was Monday.  By the time we cracked the codes, we discovered the money had been paid in on the Tuesday (when I was in hospital) and had been removed again from that account.  Ben looked at me with a mix of concern and sympathy.  The money I earnt had gone without trace.  And I had no way of finding out where that money had gone.  It's something I am still trying to do years later and I still do not have the answers."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was

referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

121.     Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not have any financial control over Ms. Brown.  Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown.  Mr. Belafonte did not steal any money from Ms. Brown, as was proven by Mr. Belafonte during the divorce proceedings. Ms. Brown did not need to crack any codes; she could have simply called her accountant.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

122.     *False Statement No. 22.*  "You are being isolated.  The strings are being pulled, but someone else – not you – is pulling them."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

123.     Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not isolate Ms. Brown.  Ms. Brown had an active social life, which she controlled. Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

124.     *False Statement No. 23.* "Mel B claims she was drugged throughout her ten-year marriage … Mel B blew £38 million – where did the money go?"  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte

as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

125.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not drug Ms. Brown and did not have any financial control over Ms. Brown.  Ms. Brown had an alcohol and substance abuse problem of her own doing, along with her own mental health challenges contributing to the addiction.  Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown.  Mr. Belafonte did not steal any money from Ms. Brown. Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

126.    *False Statement No. 24.* "He's left porn magazines open in Phoenix's bathroom."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

127.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not leave porn magazines open in his stepdaughter's bathroom.

128.    *False Statement No. 25.* "She [Mr. Belafonte's ex-girlfriend] talked about how abusive Stephen had been during their six-year relationship.  She talked about how he had tried to choke her and that he had – in 2002 – pleaded 'No Contest' to a charge of battery against her, admitting beating her in a 'malicious, drunken frenzy.'"  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements

understood she was referring to Mr. Belafonte.

129.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not choke his ex-girlfriend and did not admit to beating her in a malicious, drunken frenzy.  This ex-girlfriend later tried to extort Mr. Belafonte for "a million bucks," after Ms. Brown reached out to her and requested that she go public with her story.  Moreover, Mr. Belafonte did not physically abuse Ms. Brown.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

130.    ***False Statement No. 26.***  "Stephen had control of the finances . . . ."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

131.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not have any financial control over Ms. Brown.  Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

132.    ***False Statement No. 27.***  **"**I never saw the cruelty that was inflicted on my daughter's sweet, gentle dog, Lordy.  He was old, he had bad hips.  He would not hurt a fly. Stephen would beat him in front of Phoenix."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was

referring to Mr. Belafonte.

133.   Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not beat the dog, Lordy.  Rather, Mr. Belafonte took care of the dog and even arranged for its wellbeing when the family traveled. Moreover, Mr. Belafonte did not physically abuse Ms. Brown.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

134.   ***False Statement No. 28.***  "If I went back to them then Stephen would take it as a sign the marriage was over.  'Just one click' he would say, holding out his phone."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

135.   Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate.  Mr. Belafonte has never threatened to publicize Ms. Brown's videos or otherwise extort Ms. Brown over videos.  He did not make the statement published by Ms. Brown.  Ms. Brown orchestrated and controlled the making of certain videos involving consensual sexual encounters.  Those were choices made by Ms. Brown.

136.   ***False Statement No. 29.***  "I agreed to drop domestic violence charges in order for all the sixty four sex tapes he had made during our marriage not to be shown in open court."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

137.   Ms. Brown's statement and implication about Mr. Belafonte were factually

39

inaccurate and demonstrably false.  There were no criminal charges that Mr. Belafonte physically abused Ms. Brown. Ms. Brown dropped her allegations in the divorce proceeding because they were false, not because 64 sex tapes were going to be shown in open court.  Moreover, Mr. Belafonte did not physically or sexually abuse Ms. Brown or extort her regarding the videos.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

138.    *False Statement No. 30.*  "I have seen myself used sexually in a way that I did not enjoy or want.  Traumatized is an understatement." The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

139.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not sexually abuse Ms. Brown.  Ms. Brown orchestrated the couple's sexual activities, sometimes recorded them, and on at least two occasions shared videos of Mr. Belafonte without his consent.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

140.    *False Statement No. 31.* "I have watched porn videos many times, but these videos were not porn.  They were dark, they were out of control."   The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

141.    Ms. Brown's statement and implication about Mr. Belafonte were factually

inaccurate and demonstrably false.  Mr. Belafonte did not sexually abuse Ms. Brown.  Ms. Brown orchestrated the couple's sexual activities, sometimes recorded them, and on at least two occasions shared videos of Mr. Belafonte without his consent.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

142.   ***False Statement No. 32.***  "I finally had my own credit card attached to a shared bank account with Stephen, and I was going to make the most of it."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

143.   Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not have any financial control over Ms. Brown.  Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown.  Ms. Brown always had her own credit cards, including the Visa Black card below.

 

Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

144.   ***False Statement No. 33.***  "I didn't even know Amazon existed before April

2017, and within a matter of weeks I was their best customer." The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

145.   Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false. Mr. Belafonte did not have any financial control over Ms. Brown. Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown. Ms. Brown was also aware of Amazon before April 2017 and ordered from the site, or instructed her assistants to order from the site, on a regular basis, which Amazon reports will confirm. Ms. Brown has made these accusations in the past. Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

146.   **_False Statement No. 34._** _"_When I left Stephen, I walked away with nothing but $936 in a bank account (the only one I had access to) and suitcases full of clothes, books and toys." The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

147.   Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false. Mr. Belafonte did not have any financial control over Ms. Brown. Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown. Ms. Brown had far more money than $936 when they separated, which will be confirmed by her bank account and other financial statements. Ms. Brown has made these accusations in the past. Ms. Brown has never provided

any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

148.   ***False Statement No. 35.***  "In the past twenty something years of my life, I have made more than £80 million.  When I met my second husband, I had a house and a loft apartment in Los Angeles and a good career.  When I left him, I had less than $1,000 in the bank."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

149.   Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not have any financial control over Ms. Brown.  Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown.  Ms. Brown entered the marriage with $300,000, having already lost the £80 million she made with the Spice Girls. Ms. Brown had far more money than $1,000 when they separated, which will be confirmed by her bank account and other financial statements.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

150.   Moreover, bank statements produced by Ms. Brown during divorce proceedings show that she had a six-figure account balance during this time. Ms. Brown was also receiving $25,000 per month from in child support from her former partner, Eddie Murphy, and was in possession of hundreds of thousands of dollars of jewelry, including her $250,000 wedding ring and an $80,000 Rolex watch.  She also sold the couple's home for $7,000,000 and kept half the proceeds.  Ms. Brown has always been poor at managing her money.  She has been apart from Mr.

Belafonte for seven years, and yet to this day, she still owes taxes in the United States from when after she and Mr. Belafonte split up, and she has a tax lien in the state of California for approximately $160,000.

151.    The divorce judgment also listed extensive accounts and assets in Ms. Brown's name, of which she retained control. No evidence regarding misappropriation of or control by Mr. Belafonte over these accounts was found. On the contrary, shortly before she filed her divorce, Ms. Brown directed the accountant to close the marital joint bank account and open a new bank account to move all the couple's funds, along with future incoming funds, into her new account, leaving Mr. Belafonte with nothing.

**C.    Ms. Brown continued to defame Mr. Belafonte during her book tour.**

152.    Upon the launch of the new edition of "Brutally Honest," Ms. Brown went on a press tour, where she stated and implied that Mr. Belafonte physically and sexually abused her and had financial control over her, including but not limited to the following:

153.    ***Defamatory Publication No. 8/False Statement No. 36 (Ex. 7).*** On March 13, 2024, Ms. Brown participated in an interview for the BBC while promoting her new book. The interview was picked up by many news outlets, including People and USA Today.  There, Ms. Brown stated, "I wasn't just emotionally and physically abused, there was all the financial abuse too.  I didn't realize that I didn't have as much money as I thought I had."  The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements

44

understood she was referring to Mr. Belafonte. https://people.com/mel-b-talks-moving-back-in-with-mom-after-abusive-relationship-divorce-8608869;



CELEBRITY  >  CELEBRITY RELATIONSHIPS  >  CELEBRITY BREAKUPS

# Mel B Speaks Out About Living in Mom's Bungalow After Abusive Relationship Left Her 'Powerless'

"I wasn't just emotionally and physically abused, there was all the financial abuse, too," the Spice Girls member revealed of her former marriage

By Sadie Bell | Updated on March 13, 2024 06:20PM EDT

   



Mel B at Sirius XM Studios in New York City in January 2024. PHOTO: SANTIAGO FELIPE/GETTY

https://www.usatoday.com/story/entertainment/celebrities/2024/03/13/mel-b-spice-girls-marriage-move-back-home-mom/72955356007/



154.  Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown nor did he have any financial control over her.  Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown.  And Ms. Brown's litigious conduct during the divorce drained both parties of their funds.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

155.  ***Defamatory Publication No. 9/False Statement No. 37 (Ex. 8).***  On March 26, 2024, on the Tamron Hall show, Mel B stated "He's "already been charged for domestic violence

46

before me, which I just found about" and "I found out that I was not only abused on different levels, but also financially abused" and "I was not looking for anything with anybody. I was done trying to be intimate."  https://tamronhallshow.com/episodes/3-26-24/

The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

156.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown nor did he have any financial control over her.  Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown.  Ms. Brown also knew about Mr. Belafonte's past charge, as she notes in her book.  She also was intimate with many people after her split from Mr. Belafonte, so much so that those around her expressed concern over her behavior. Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

157.    ***Defamatory Publication No. 10/False Statement No. 38 (Ex. 9).*** On March 28, 2024, on the Drew Barrymore show, Mel B stated, "They abuse emotionally, physically, and financially, and before you know it, you are trapped."   https://www.youtube.com/watch?v=-tu6TufAWEs

The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

158.    Ms. Brown's statement and implication about Mr. Belafonte were factually

inaccurate and demonstrably false.  Mr. Belafonte did not physically abuse Ms. Brown nor did he have any financial control over her.  Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown.  Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

159.    ***Defamatory Publication No. 11/False Statement No. 39 (Ex. 10).***    On April 9, 2024, at an appearance on "Relationshit w/Kamie Crawford," (available at < https://www.youtube.com/watch?v=I56phWFeRRg >), Ms. Brown stated as follows: (1) "She saw me being sexually abused." (2) Regarding her 2014 suicide attempt: "He locked the bathroom door, and he left me to die basically and didn't let me get to the ambulance." (3) "I was about to full on charge him with domestic violence, kidnapping one of my kids, everything."
The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

160.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically or sexually abuse Ms. Brown. Mr. Belafonte did not lock the bathroom door, leave her to die and prevent her from getting to the ambulance. He did not kidnap one of her children. Ms. Brown has made these accusations in the past.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

161.    ***Defamatory Publication No. 12/False Statement No. 40 (Ex. 11).***    On August 30, 2024, on the CNBC Conversation, Ms. Brown stated, "I've been abused on every single level." "You        don't        have        your        own        credit        card,        your        own        phone"

(https://www.cnbc.com/video/2024/08/30/ai-was-completely-girl-powerlessa-mel-b-on-domestic-abuse.html)

The context surrounding Ms. Brown's statement made clear to a reasonable reader that she was referring to Mr. Belafonte as the cause of her situation and, on information and belief, people who read the statements understood she was referring to Mr. Belafonte.

162.    Ms. Brown's statement and implication about Mr. Belafonte were factually inaccurate and demonstrably false.  Mr. Belafonte did not physically or sexually abuse Ms. Brown nor did he have any financial control over her.  Ms. Brown had control over her bank accounts and the family had an accountant who oversaw spending, with notifications going to Ms. Brown.  Ms. Brown has never provided any evidence (tangible or otherwise) to support the accusations or third-party support for the accusations.

## V.    Ms. Brown made her defamatory statements with actual malice and a specific intent to harm Mr. Belafonte.

163.    Ms. Brown made her defamatory statements with actual malice.  One, Ms. Brown knows her accusations about Mr. Belafonte are factually inaccurate.  Ms. Brown's accusations involve one-on-one activities between her and Mr. Belafonte as well as group activities that she orchestrated and controlled.  As a result, Ms. Brown know the activities that she claimed took place did not take place.

164.    Two, Ms. Brown know that she has made these defamatory accusations about Mr. Belafonte repeatedly over the years since their divorce.  Ms. Brown knows that she has never provide any evidence (tangible or otherwise) to support her accusations.  She also know that no

one has ever come forward with statements in support of her accusations.  She knows she lacks that evidence because the accusations are fabricated.

165.    Three, Ms. Brown has made these defamatory accusations with improper motive. Ms. Brown has made these statements because she hates Mr. Belafonte and wants to do him harm. Ms. Brown has a longstanding grudge against Mr. Belafonte and wants to do everything in her power to hurt him.  Ms. Brown knew and intended for her statements about Mr. Belafonte to harm Mr. Belafonte.

166.    Moreover, Ms. Brown made her statements to make herself a symbol, and thus collect money and attention while promoting her brand.  She now has a career as a domestic violence advocate. Through her relationship with the Sun, she was named a patron of Women's Aid in the UK, and was later appointed Member of the Order of the British Empire (MBE) and received an honorary doctorate from Leeds Beckett University. She advertises her book on her social media channels and, on information and belief, has made a substantial amount of money from book sales.

## VI.    Mel B's Defamatory Statements Irreparably Harmed Mr. Belafonte

167.    Ms. Brown's defamatory publications and statements have harmed Mr. Belafonte by permanently impairing his reputation.  Mr. Belafonte is now known to the millions of people who heard and read Ms. Brown's defamatory publications and statements as someone who physically and sexually abused his ex-wife and exercised financial control over his ex-wife.

168.    As a result of Ms. Brown's defamatory publications and statements, Mr. Belafonte has received hate comments and messages on social media platforms, as well as threatening messages from strangers that, on information and belief, are fans of Ms. Brown's.  Mr. Belafonte

does not have anything close to Ms. Brown's fame and popularity so she has used that power position to poison people against Ms. Belafonte.

169.    Ms. Brown's defamatory publications and statements have also caused significant emotional harm to Mr. Belafonte.  Mr. Belafonte has wanted to put his time with Ms. Brown behind him and start his life afresh. Ms. Brown has made that impossible.  Her defamatory publications and statements have haunted him, hurt his relationships with others, prevented him from earning money and growing his business, and caused great mental anguish and suffering.

170.    For example, multiple individuals who Mr. Belafonte was in discussions with regarding business partnerships and management deals informed him that they were not interested in pursuing any partnerships as a result of Ms. Brown's statements.  And potential romantic partners have cited Ms. Brown's defamatory statements as reasons why they are not interested in pursuing a relationship with Mr. Belafonte.

**COUNT I – DEFAMATION**

171.    Mr. Belafonte repeats, realleges, and incorporates by reference Paragraphs 1 to 170 as if fully stated herein.

172.    Ms. Brown published and republished false statements and implications about Mr. Belafonte, including but not limited to (1) Mr. Belafonte physically abused Ms. Brown, (2) Mr.

Belafonte sexually abused Ms. Brown, and (3) Mr. Belafonte financially controlled Ms. Brown. The false statements and implications are pleaded in Paragraphs 75 to 162 of the Complaint.

173.    Ms. Brown's false statements and implications about Mr. Belafonte were and would reasonably be understood to be statements of fact.

174.    Ms. Brown's false statements and implications about Mr. Belafonte were and would reasonably be understood by third parties to have a defamatory character.

175.    Ms. Brown's false statements and implications about Mr. Belafonte were defamatory *per se* because they charged Mr. Belafonte of the heinous crimes of physical, sexual, and financial abuse.  Further, these statements tend to—and in fact did—subject Mr. Belafonte to hatred, distrust, ridicule, contempt, and disgrace.  Ms. Brown's statements are so obviously defamatory and damaging to a person's reputation that they give rise to an absolute presumption of both malice and damage.

176.    The defamatory statements were communicated to a person or persons other than Ms. Brown, including to individuals located in Florida and this District.  Ms. Brown's book is accessible in Florida and has been advertised and sold in Florida.  Further, Ms. Brown directed defamatory statements to a recording artist who is a Florida resident.

177.    Ms. Brown made her defamatory statements with actual malice.  She knew her statements were false when she communicated them.  Ms. Brown knows that Mr. Belafonte never physically or sexually abused her or had financial control over her, but she still stated or implied that he did.  Further, Ms. Brown made these statements for improper purposes.  She made these statements to make herself a symbol of domestic abuse, thus elevating her status while lining her

pockets.  Finally, she made these statements because she hates Mr. Belafonte and wants to do him harm.

178.    Mr. Belafonte has suffered, and will continue to suffer, reputational and financial harm as a direct result of Ms. Brown's defamation campaign.  Mr. Belafonte has been the subject of hatred and ridicule from Ms. Brown's fans and has lost out on multiple business opportunities due to Ms. Brown's statements.  Mr. Belafonte has also suffered further actual and consequential damages, in an amount that will be proven at trial, as a direct result of Ms. Brown's defamation, including but not limited to reputational harm, emotional distress and mental anguish, and the costs associated with attempting to correct the injury caused by Ms. Brown's defamation.

**PRAYER FOR RELIEF**

Wherefore, Mr. Belafonte prays for a judgment against Ms. Brown for each of the causes of action raised herein.  Mr. Belafonte respectfully requests a judgment in his favor and against Ms. Belafonte as follows:

       a.     Compensatory damages in an amount to be determined at trial;

       b.     Actual, consequential and special damages in an about to be determined at trial, but no less than $5,000,000;

       c.     Punitive damages;

       d.     Reasonable and necessary attorneys' fees;

       e.     Reasonable and necessary costs of the suit;

       f.     Prejudgment and post-judgment interest at the highest lawful rate;

       g.     Declarative and injunctive relief; and

       h.     Such other and further relief as this Court deems just and appropriate.

## DEMAND FOR TRIAL BY JURY

Please take notice that Mr. Belafonte hereby demands trial by jury for all issues so triable.

Dated: October 18, 2024                       Respectfully submitted,

                                              /s/ Roberto Ledesma
                                              Roberto Ledesma
                                              roberto@iLawco.com
                                              David D. Lin
                                              david@iLawco.com
                                              Anna Iskikian

                                              **LEWIS & LIN, LLC**
                                              77 Sands Street, 6th Floor
                                              Brooklyn, NY  11201
                                              Tel:  (718) 243-9323
                                              Fax:  (718) 243-9325

                                              *-and-*

                                              J. Erik Connolly (pro hac vice forthcoming)
                                              econnolly@beneschlaw.com
                                              Bryna Dahlin (pro hac vice forthcoming)
                                              bdahlin@beneschlaw.com

                                              **BENESCH, FRIEDLANDER,
                                              COPLAN & ARONOFF LLP**
                                              71 South Wacker Drive, Suite 1600
                                              Chicago, IL  60606
                                              Tel:  (312) 212-4949
                                              Fax:  (312) 767-9192

                                              *Counsel for Plaintiff Stephen Belafonte*